# EXHIBIT 1

*filed in Chambers*
*12/08/2006 9:10 am.*
*Deia Chamberlain*
*Deputy Clerk*

## UNITED STATES BANKRUPTCY COURT

## FOR THE WESTERN DISTRICT OF MICHIGAN

In Re:

CYBERCO HOLDINGS, INC.,

   Debtor.

            /

Chapter 7
Case No. 04-14905
Hon. Jeffrey R. Hughes
Bankruptcy Court Judge

THOMAS C. RICHARDSON, Trustee of
Cyberco Holdings, Inc.,

   Plaintiff,

v

THE HUNTINGTON NATIONAL BANK,
A national bank,

   Defendant.

            /

Adv. Pro. No. 06- **80989**

**COMPLAINT**

Mark A. Kehoe (P28629)
Douglas A. Donnell (P33187)
Ronald J. Clark (P11940)
Mika Meyers Beckett & Jones PLC
Attorneys for Plaintiff Thomas Richardson
900 Monroe, N.W.
Grand Rapids, MI 49503
(616) 632-8000

            /

   NOW COMES Plaintiff, Thomas C. Richardson, duly qualified, appointed and acting

Chapter 7 Trustee, by and through his attorneys, Mika Meyers Beckett & Jones PLC, and for his

Complaint against Defendant states as follows:

## I. INTRODUCTION

1.     Barton Watson masterminded a Ponzi scheme that cost scores of lenders and equipment finance companies collective losses approaching $100 million. His bank for the last two years of this massive fraud was The Huntington National Bank ("Huntington"). Not surprisingly, Huntington now distances itself from Watson and his small group of co-conspirators, and at the outset of Huntington's relationship with Watson and Cyberco in 2002, there is no reason to believe Huntington knew what Watson was up to. But over the course of the next 18 months, during which Huntington extended credit up to $17 million, Huntington allowed Watson to virtually ignore key provisions in their loan agreement by, among other things, not using the mandated lockbox for collection of receivables, not requiring submission of audited financials, covering seven figure overdrafts and honoring numerous NSF checks.

2.     By January 2004, Huntington had decided to force Cyberco and Watson to exit the bank because of the repeated self-described "red flags" the bank kept encountering. Nonetheless, it allowed several extensions of the credit totaling an addition 10 months, during which Huntington successfully pressured Cyberco to completely pay off the entire debt. This was accomplished by October 2004, one month before the FBI raided Cyberco's offices. However, during the time Huntington was scrambling to get the credit paid off, Watson and his co-conspirators used Huntington's continued funding to shift the Ponzi scheme into high gear, bringing in more and more victims to keep the Cyberco boat afloat. Huntington was an essential ingredient for perpetuating Watson's pattern of criminal fraud.

3.     What Huntington knew and when is important. The Huntington bankers on this account were all experienced in commercial lending, and the history of the relationship with Cyberco and its key principals highlights an astounding series of events that leads to one

2

conclusion – the bank figured out that Watson was a crook and tried to get out of a huge liability by buying time and pressuring for paydowns, not paying too close attention to where the money was coming from. In fact, virtually all of the money was coming from Teleservices Group, Inc. ("Teleservices"), a company controlled by Watson and known by Huntington to share the same address as Cyberco, and which had absolutely no reason to be paying Cyberco any money, much less tens of millions over a 10-month period.

## II. JURISDICTION AND VENUE

4.      This Court has original subject matter jurisdiction of this proceeding pursuant to 28 USC 1334(b) as it relates to a case under the United States Bankruptcy Code. Specifically, this proceeding is related to *In Re: Cyberco Holdings, Inc.*, Chapter 7, United States Bankruptcy Court – W.D. Mich. Case No. 04-14905. In addition, this Court has jurisdiction over this adversary proceeding pursuant to 11 USC 105, 547(b), 548, 551 and various other applicable provisions of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure and the laws of the United States.

5.      Venue is proper in this judicial district pursuant to 28 USC 1409(a) because this proceeding is related to a case under the United States Bankruptcy Code that is pending in this district. Moreover, Huntington conducts substantial business within the Western District of Michigan and the actions giving rise to this Complaint occurred within this district.

6.      This proceeding is, in part, a core proceeding pursuant to 28 USC 157(b)(2)(A), (F) and (O) because it involves matters concerning the administration of the bankruptcy estate and because it involves proceedings to determine, avoid and recover preferences and fraudulent transfers pursuant to 11 USC 541, 544, 547, 548 and 550.

7.    This action is properly brought as an adversary proceeding pursuant to Fed.R.Bankr.P. 7001(1) because this is "a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) or § 725 of the Code, Rule 2017, or Rule 6002."

8.    A bankruptcy case concerning the Debtor corporation, Cyberco Holdings, Inc. ("Cyberco") was filed under Chapter 7 on December 9, 2004 ("Petition Date").

9.    Plaintiff is the Trustee appointed in Cyberco's bankruptcy case.

10.   Defendant Huntington is a national bank whose principal place of business is located in Columbus, Ohio.  Huntington transacted business with the Debtor prior to the Petition Date.  The United States Bankruptcy Court for the Western District of Michigan has personal jurisdiction over Defendant.  Further, the Defendant is subject to nationwide service of process pursuant to Fed.R.Bankr.P. 7004(d) and (f).

### III. FRAUD COMMITTED BY KEY PRINCIPALS

11.   Cyberco was incorporated in the State of Michigan in January 1992 as a for-profit corporation providing computer consulting services and sales.  Cyberco also did business under the names Cybernet Engineering and CyberNET.  In a July 2001 filing by Cyberco, its officers were identified as James Horton, President ("Horton"); Barton Watson, Secretary ("Watson"); and Krista Kotlarz (a/k/a Krista Watson and Krista Kotlarz-Watson), Treasurer ("Kotlarz").  In a May 2002 filing for Cyberco, David Roepke ("Roepke") was identified as the Controller.  Other business records between 2001 and 2004 describe Watson as the Chairman and Chief Executive Officer, Horton as the President and Chief Operating Officer, and Roepke as the Vice President of Finance or Chief Financial Officer.  With respect to the actions and events described herein, except where noted otherwise, Watson, Horton and/or Roepke were the key principals of

Cyberco who directed and controlled the actions of Cyberco. Hereafter, these three individuals collectively are referred to as the "Principals" of Cyberco.

12.     Huntington's involvement with Cyberco began in 2002. At this time, the above-named Principals were engaged in a scheme to defraud leasing companies and other financial institutions throughout the United States, using fraudulent financial reports, tax returns, invoices, checks, and other documents and instruments. The Principals used affiliated corporations, including Teleservices, Corporate Property Associates, and T-Resources, to engage in various frauds. The most significant of these was a Ponzi scheme, using new loans to pay off old loans in an ever increasing cycle of debt, all to the detriment of Cyberco's creditors and ultimate financial ruin of Cyberco.

13.     Huntington began its relationship with Cyberco at a critical point in the Principals' Ponzi scheme. All Ponzi schemes will inevitably collapse under their own weight. The only way the Principals' scheme could be prolonged was if someone provided the money to make payments on the old loans. Huntington's financing provided the "working capital" needed to enable the Principals to operate while obtaining new loans from new victims of the scheme.

14.     Watson had a long history of involvement in fraudulent activity. In 1994, Watson entered into a Consent Judgment in an action filed in the U. S. District Court for the Western District of Michigan, Case No. 1:94-cv-686, captioned *United States of America v Barton Watson*. In this Consent Judgment, Watson acknowledged that the allegations in the United States' Complaint filed against him were true and accurate, which allegations included the fact that Watson had engaged in bank fraud by submitting a false tax return to Old Kent Bank which both misrepresented the preparer of the tax return and the actual adjusted gross income. Watson agreed to entry of a judgment in favor of the United States in the amount of $5,000.

15.     In 1998, a Complaint was filed in Kent County Circuit Court, Case No. 98-04488-CZ, against Kotlarz and Cyberco Holding, Inc., d/b/a Cybernet Engineering, alleging fraudulent transfers of money and assets from Watson to Kotlarz. The Complaint also alleged that Watson had previously had a civil fraud judgment entered against him in California in 1986.  The Kent County Complaint alleged that the California action, the plaintiff alleged that Watson took, embezzled and misappropriated by fraudulent scheme and false pretenses large sums of money from the plaintiffs by, among other means, forging signatures, falsifying documents, using fictitious addresses, making oral and written misrepresentations, deliberately violating federal securities laws, selling unregistered and bogus securities, intentionally making and delivering insufficient funds checks and taking large sums of money for his own purposes.  Judgment in the amount of $945,082 was entered by the California court against Watson, which judgment included $500,000 in exemplary damages. The Kent County Circuit Court action was resolved by settlement of the parties with undisclosed payment terms.

16.     In March 1987, Watson pled guilty to a one-count criminal Information for mail fraud in the U. S. District Court, Washington, DC, and was sentenced to three years in jail and ordered to make restitution in the amount of $230,000.

17.     Additionally, as a result of improper actions while he was employed with E.F. Hutton, Watson was fined $25,000, censured and barred from any association in any capacity with any member of the National Association of Security Dealers (NASD).

18.     One method used by the Principals of Cyberco to defraud banks and other financial institutions as a part of their Ponzi scheme was as follows:  One of the Principals of Cyberco would contact a bank or equipment leasing company and make arrangements for that entity to purchase computer equipment from Teleservices, a vendor selected by the Principals,

and lease the equipment to Cyberco over a period of time. The full purchase price for the equipment would be paid by the bank or leasing company to Teleservices, and monthly lease payments would be paid by Cyberco to the bank or leasing company over a specified period of time. Although Teleservices, a corporate entity controlled by some of the Principals of Cyberco, typically would not actually supply or deliver any equipment, it would generate and deliver to the bank or leasing company a phony invoice for the phantom computer equipment. Cyberco would likewise generate a fraudulent acknowledgment of delivery of the phantom computer equipment from Teleservices and supply it to the bank or leasing company to verify receipt of the goods. Upon receipt of the acknowledgment from Cyberco that the computer equipment had been delivered as promised by Teleservices, the bank or leasing company would then pay the full amount of the purchase price to Teleservices, which in turn would funnel the money back to Cyberco. Some of this money would then be used to pay prior equipment leases similarly created by the Principals of Cyberco, and some of the money was simply looted from Cyberco for the benefit of the Principals.

19.     To further their fraudulent scheme, Watson generated and continually updated phony accounts receivable reports purporting to represent current and aged accounts receivable owed to Cyberco from customers of Cyberco. Such fictional accounts receivable reports were provided to various lenders and/or equipment leasing companies for the purpose of convincing them that Cyberco was financially viable and creditworthy for the lease transaction being contemplated.

20.     In reality, the false accounts receivable reports provided to financial institutions by the Principals of Cyberco contained fictitious customers and/or fictitious amounts that did not reflect the true amount, if any, owed to Cyberco by those customers.

7

21.     By way of example only, one such report represented that Tokyo Electron owed Cyberco $434,142.55 as of December 31, 2002.  In reality, it was later confirmed that Tokyo Electron owed nothing as of December 31, 2002, and that Tokyo Electron had done no business with Cyberco since early 2001.

22.     In late 2003, the accountant for Cyberco, Guy Hiestand ("Hiestand"), asked Horton for proof of the Tokyo Electron receivable.  Horton then produced two fabricated checks, one in the amount of $151,193.58 and another in the amount of $282,948.79, explaining that after the date of the A/R report showing the December 31, 2002 receivable, the full amount had been paid by Tokyo Electron.

23.     The two fraudulent checks produced to Hiestand by Horton were checks altered by Horton or others at his direction using checks previously issued by Tokyo Electron and dating back to February and April of 2001.  One of the altered checks was actually issued in the amount of $6,885, not $151,193.58 and the other altered check was actually issued in the amount of $6.18, not $282,948.79.

24.     Similarly, Watson and/or Horton represented to financial institutions that as of December 31, 2002 Citrus World, Inc., a/k/a Florida Growers, owed Cyberco $505,053.66.  When Hiestand later requested verification of this receivable from Horton, Horton provided a fraudulent check from Citrus World dated March 5, 2003 purportedly paying the full amount of the claimed receivable.  It was later confirmed by Citrus World that that check had actually been issued on June 7, 2001 from Citrus World to Cyberco in the amount of $6,120, not $505,053.66.

25.     In yet another example of a falsified account receivable record prepared by Watson and designed to mislead financial institutions, the A/R report as of March 31, 2003 indicated that Lockheed Martin owed Cyberco $1.3 million.  At that time, Lockheed Martin had

no contract with Cyberco and owed no money to Cyberco. The only contract Lockheed Martin could later identify for FBI investigators was a purchase order from 1999 in the amount of $9,412, and a purchase order from 2000 in the amount of $438.

26.    In addition to preparing and distributing fraudulent accounts receivable reports to financial institutions, one or more of the Principals also generated false tax returns for Cyberco. These tax returns inflated the actual revenues generated by Cyberco and falsely represented tax payments made to the IRS from Cyberco.

27.    In yet another facet of the Principals' fraudulent scheme, they created fake mailing addresses and telephone numbers for fictional customers of Cyberco so that if a prospective lender or leasing company wanted to contact one or more customers of Cyberco, the lender would be provided these addresses or contact numbers to verify the customer's status and satisfaction with Cyberco. The addresses used were nothing more than mail boxes where arrangements had been made to forward all mail received to Cyberco in Grand Rapids.

28.    Likewise, the telephone numbers established for these fictional customers were routed to an answering service which would relay messages to Horton or Watson who, in turn, would use an alias name and return the phone calls pretending to be an employee of the fictional customer.

29.    By way of example only, Watson or Horton directed the establishment of a mailing address for Electronic Data Systems, Box 366, 3818 Cedar Springs Road, Dallas, TX. This address was the address for Mail Boxes, Etc. and the mail box was held in the name of Cybernet Engineering. They established a similar mail box for IBM Credit Corporation, 211 South Street, #321, Philadelphia, PA. This address was likewise the address for Mail Boxes, Etc.

30.    In furtherance of their fraudulent scheme, the Principals of Cyberco financed many of the same computer servers obtained through one leasing arrangement multiple times with different lenders.

31.    An example of this technique occurred in May and June 2004. Charter One of Lisle, IL purchased two lease agreements between Cyberco and Oliver-Allen Technology Leasing, a division of U.S. Bancorp.  According to the two lease agreements, Oliver-Allen was to finance Cyberco's lease of 66 computer servers which were to be provided by Teleservices. After Horton of Cyberco verified receipt of the servers from Teleservices, Oliver-Allen sent Teleservices a check and wire transfer totaling $2,904,533.90.  Teleservices did not deliver any of the 66 computer servers to Cyberco.

32.    Following payment by Oliver-Allen to Teleservices, Charter One then purchased the finance agreements from Oliver-Allen, paying over $3 million.  Cyberco was to then pay Charter One $77,000 per month over a 47-month period.

33.    After Charter One's purchase of the above finance agreements for the 66 servers, Horton and/or Watson requested financing for the leasing of 70 additional servers.  They claimed they were in the process of negotiating a financing contract with General Electric who would then subsequently sell the contract to Charter One.  The vendor for the servers was again Teleservices.

34.    As part of this arrangement, Watson or Horton caused Teleservices to send an invoice to Charter One, but carelessly, only 62 servers were listed on the invoice.  Charter One contacted Teleservices and requested another invoice, which was sent by Watson or Horton acting for Teleservices, but this time 19 of the serial numbers listed on this invoice were also pledged as collateral to yet another finance company, Technology Lending Partners.

35.     Because of the discrepancy, Charter One requested yet another invoice, which Teleservices sent with 25 serial numbers that were also listed on the earlier Oliver-Allen contract.  Once Charter One became suspicious of the same servers being financed multiple times, Charter One conducted a UCC search and identified that additional servers listed on the Oliver-Allen contract were also listed as collateral with still another finance company, Southwest Leasing.

36.     In another artifice intended to dupe potential lenders into believing that Cyberco was a large and rapidly growing business, creditworthy for the many leasing transactions it entered into, one or more of the Principals of Cyberco falsified the serial number labels on many computer servers located at Cyberco's business address, 25 South Division, Grand Rapids, Michigan.

37.     On multiple occasions, Watson and/or Horton created or had others create at their direction, serial number labels to place on computer servers whenever a physical audit or inventory was to be conducted by a finance company.  Such activities occurred during 2003 and 2004.  Many of the computer servers had been relabeled with different serial numbers multiple times so that each leasing company who physically inspected the equipment was led to believe that the servers identified by particular serial numbers in its lease agreement were physically present at the Cyberco site and providing real collateral for the lease/financing.

38.     In addition to labeling and relabeling the same servers with different serial numbers, Watson also authorized creation of fake computer servers which were made by purchasing empty computer boxes and installing blinking lights in them so they would appear to be functioning servers.  These "blinking boxes" were used to fool potential customers into believing that Cyberco had a larger inventory of computer equipment than actually existed.  By

11

the time the FBI conducted a search of Cyberco's premises in November 2004, hundreds of fake computer servers were discovered with no working components, most of which had a Teleservices logo and serial number affixed to them.

39.    The various fraudulent activities described above were used by the Principals of Cyberco to facilitate a Ponzi scheme pursuant to which proceeds from equipment purchase/lease transactions were used to fund personal expenditures along with other monthly payments on previous loans.  By late 2004, Cyberco had obtained by fraud equipment financing from over 40 financial institutions to whom monthly rental payments were being made.  As with most Ponzi schemes, the Principals of Cyberco were forced to increase both the amount and frequency of fraudulent new purchase/lease deals in order to pay off existing fraudulent lease obligations, support lavish lifestyles, and hide prior looting and mismanagement of Cyberco's assets.  And, in order to obtain the new deals, the Principals of Cyberco needed the "working capital" provided by Huntington.

40.    This accelerating cycle of fraudulent transactions prolonged the existence of Cyberco well beyond the point of insolvency, allowing Principals to burden Cyberco with a substantially greater amount of debt (that was then looted and mismanaged) than would have been incurred had a timely bankruptcy petition been filed.

41.    Among the various types of looting of corporate assets that occurred by Principals were the use of corporate funds for deposits into personal bank accounts of some of the Principals, purchase of an airplane, payment for multiple homes and properties, vast wine collections, extravagant vacations, credit card purchases, company cars and personal income taxes.

42.     In addition to the above looting, funds fraudulently obtained by the Principals of Cyberco were used to acquire various assets for personal use, including a 2002 BMW X5 automobile, purchases from Saks Fifth Avenue and Niemen Marcus, payments for a 2004 Ferrari automobile, extravagant home furnishings, collectibles and sculptures, high end electronics at personal residences, equine medical expenses for privately owned horses, purchase of expensive works of art, a 2000 Bentley automobile, and a 2004 Rolls Royce automobile.

43.     Notwithstanding the ever increasing level of fraud perpetrated by the Principals, there remained throughout this time a small portion of Cyberco's business activities that provided real services and real goods to real customers most or all of whom paid their legitimate Cyberco bills to Cyberco's lockbox account at Huntington, described in greater detail below.

44.     On or about June 22, 2006, Horton entered a plea of guilty to charges of criminal conspiracy in violation of 18 USC 371, bank fraud in violation of 18 USC 1344, and money laundering in violation of 18 USC 1956 and 1957. These charges to which Horton pled guilty all arose out of Horton's role as a Principal who had engaged in the activities described above. Likewise, on November 16, 2006, Roepke pled guilty to criminal charges of money laundering in violation of 18 USC 1956. These charges all arose out of Roepke's role as a Principal.

45.     Watson took his own life in his Ada home a week after the F.B.I. raid on Cyberco.

### IV. HUNTINGTON'S INVOLVEMENT WITH THE FRAUD

46.     During 2002, Cyberco and Huntington entered into discussions regarding the possibility of Huntington becoming Cyberco's primary banking institution.

47.     On June 27, 2002 and October 22, 2002, Huntington purchased Key Bank's interest in equipment leases with Cyberco for equipment allegedly purchased from Teleservices by Key Bank and then leased to Cyberco. Attached to each of the two assignments to

13

Huntington were the Key Bank lease agreements which expressly identified Teleservices as the supplier of the equipment. (See Exhibits 1 and 2 attached hereto and incorporated herein by reference)

48.     On October 25, 2002, Huntington and Cyberco entered into a Revolving Credit Loan Agreement ("Loan Agreement"), a copy of which is attached as Exhibit 3 and incorporated herein by reference.

49.     Pursuant to the Loan Agreement and the Revolving Note (attached to the Loan Agreement as Exhibit A), Huntington agreed to advance up to $9,000,000. The amount available to be advanced was determined by application of a formula to Cyberco's eligible accounts receivable and inventory. By way of example, on October 25, 2002, the amount of Cyberco's credit availability was $8,590,788.10 (see Borrowing Base Certificate attached as Exhibit 4 and incorporated herein by reference).

50.     On October 25, 2002, Cyberco and Huntington also entered into a Security Agreement whereby Huntington acquired a security interest in virtually all of the assets of Cyberco. A copy of the Security Agreement is attached as Exhibit 5 and incorporated herein by reference.

51.     Pursuant to the Loan Agreement and the Security Agreement, Huntington and Cyberco also entered into a Controlled Disbursement Agreement, a copy of which is attached as Exhibit 6 and incorporated herein by reference. The Controlled Disbursement Account was to be funded from Cyberco's Zero Balance Account or its Concentration Account held at Huntington.

52.     Pursuant to the Loan Agreement and the Security Agreement, Huntington and Cyberco also entered into a Lockbox Agreement, a copy of which is attached as Exhibit 7 and incorporated herein by reference. This agreement allowed Huntington to collect and endorse all

accounts receivable that were mailed to the lockbox and deposit them into Cyberco's Zero Balance Account. At the end of each business day, the Zero Balance Account was swept and applied to reduce the line of credit. Re-advances would be subsequently made pursuant to the borrowing base formula.

53.     The Loan Agreement, Security Agreement and Lockbox Agreement *required* Cyberco to instruct *all* of its customers to make *all* payments to Cyberco directly to the Huntington lockbox. This arrangement was designed to allow Huntington to monitor and control Cyberco's accounts receivable, which were the bank's primary collateral.

54.     Over the course of the two year relationship between Cyberco and Huntington, they entered into eight amendments to the Loan Agreement. Amendments Four through Eight are attached as Exhibits 8 through 12 and are incorporated herein by reference.

55.     Prior to execution of the Loan Agreement with Cyberco, Huntington retained Lender Services to conduct a pre-funding audit of Cyberco. Dave Emig of Huntington ("Emig") reviewed the pre-funding audit report and noted that the field work performed by Lender Services was conducted entirely outside the Cyberco office. In a memo dated October 17, 2002 attached as Exhibit 13 and incorporated herein by reference, he stated ". . . the only true concern I have is that 100% of our understanding obtained was 'channeled' through one person (James Horton)."

56.     In the same memo, Emig also observed that Lender Services' verification of accounts receivable of Cyberco was rendered more difficult because "...only the most basic level of supporting documentation was provided to the auditor (time sheets etc. were requested, but not provided). The audit report contained much 'cover your rear' type language regarding the

verification of these receivables." He later stated in that memo, "Making the <u>assumption</u> that all service billings are valid, the 80% advance rate appears reasonable. . ." (emphasis in original)

57. Pursuant to the Loan Agreement, Huntington had advanced Cyberco the full amount of the $9,000,000 line of credit by the end of December 2002.

58. Notwithstanding the establishment of a lockbox by December 2002, Cyberco did not direct substantial customer payments to the lockbox as required by the Security Agreement with Huntington at any time. Instead, only a miniscule percentage of receivables shown on Cyberco's books was paid into the lockbox. The nearly complete disregard for the lockbox as the contractually mandated method of collecting and monitoring Cyberco's receivables was obvious and clearly known to Huntington at all times. Had Huntington required Cyberco to exclusively use the lockbox for collection of its receivables, the Ponzi scheme would have collapsed, and many of its victims would have been spared the loss of millions of dollars.

59. In a letter dated December 19, 2002, Kelly Hutchings ("Hutchings"), Huntington's relationship officer on the Cyberco account, authorized Key Equipment Finance to file a UCC financing statement with respect to equipment identified in her letter as being purchased from Teleservices and sold to Cyberco. Teleservices was clearly identified by Hutchings as the vendor of the equipment being purchased and then leased to Cyberco (see Exhibit 14 attached hereto and incorporated herein by reference).

60. By the first week in January 2003, barely two months into the relationship, Hutchings reported that Cyberco substantially overdrew its account with Huntington on December 30, 2002, by roughly $800,000. Horton's "explanation" to Hutchings for the large overdraft was an unexpected delay in payment of $1.6 million from Cargill, a purported customer of Cyberco.

61.     Inexplicably, Huntington simply accepted Horton's false explanation at face value without making any further inquiry as to its truth.  Instead, Huntington increased Cyberco's line of credit to cover Cyberco's outstanding overdrafts and obligations (see Hutchings' memo dated January 7, 2003, attached as Exhibit 15 and incorporated herein by reference).  But for Huntington's honoring the overdrafts and extending additional credit to Cyberco, the Principals' fraudulent scheme would have collapsed then and there.

62.     Roughly six weeks after the Cargill-related overdrafts, in the middle of February 2003, John Kalb ("Kalb"), Senior Vice President, Regional Credit Officer of Huntington, expressed serious concern regarding the Cyberco account due to another series of substantial overdrafts totaling over $400,000 which Horton or Watson explained were caused by an unexpected delay in receipt of a deposit from Lockheed Martin.  In a series of e-mails between Kalb and Hutchings starting on February 18, 2003, Kalb expressed his nervousness about the Cyberco overdrafts and asked Hutchings "provide me with a complete explanation and we may need a deeper credit dive to understand if there is any 'fire' behind the 'smoke.'"  Hutchings responded on February 18 by informing Kalb that Cyberco had not yet converted to use of the Huntington lockbox and "thus all funds are jot [sic] yet flowing through our Bank."  Kalb responded "The smoke gets thicker.  Maybe this is only smoke but I am not sure I would float this OD any longer.  The time to close it out is now.  Even then, we have a lot of money out to them and further investigation is warranted."  See e-mails attached as Exhibit 16 and incorporated herein by reference.[1]

---

[1] This Exhibit 16, as well as Exhibits 22, 24, 25, 26, 27, 29, 30, 31, 33, and 43 were retrieved from a computer disc supplied by Huntington.  When these documents are printed, the date that appears on the last e-mail is not the date of the e-mail, but rather the date the document was printed from the disc.  The dates of these documents stated in this Complaint are based upon the dates shown on the documents when viewed from the disc itself.

63. On March 5, 2003, Hutchings requested Cyberco to provide copies of two Cyberco contracts on a spot-check basis; one for Pharmacia Corporation, and the other for Metro Health System. Additionally, Hutchings requested Cyberco to provide her the names and numbers of two or three Cyberco customers whom the bank could contact regarding Cyberco's performance and to obtain account verification.

64. In response to this request, one of the Principals, in a flagrant breach of the Loan Agreement, refused to provide names and numbers of customers. If Huntington had exercised its right to contact even one customer on Cyberco's AR reports, the Ponzi scheme would have unraveled because the inquiry would have revealed the AR report was false, and the victims over the next 18 months would have avoided tens of millions in losses.

65. Horton did provide two agreements that purported to be agreements with Pharmacia and Metro Health. When Hutchings reviewed these two contracts, however, she found a number of peculiarities, including the fact that one contract was dated March 3, 2003, but ostensibly signed on January 20, 2003, and the other contract ostensibly signed on February 29, 2003, when there was no February 29, 2003 (i.e., 2003 was not a leap year). (See Hutchings' e-mail to Horton dated March 11, 2003, attached as Exhibit 17 and incorporated herein by reference.)

66. By early March 2003, Cyberco requested an increase in their line of credit to $13,000,000. In the face of substantial and repeated overdrafts in a very short period of time, and Cyberco's obvious refusal to use the lockbox as mandated by the loan agreements, Huntington recklessly granted the full amount of the credit extension without requiring full use of the lockbox.

67.     The continued failure by Huntington to require full use of the lockbox coupled with its reckless extension of credit enabled the Principals to perpetuate and expand the scope and extent of their fraudulent activities, further loot the assets of Cyberco, hide their prior mismanagement of the company, and deepen the insolvency of Cyberco to the detriment of all its creditor victims.

68.     Notwithstanding overdrafts in January and February 2003 well into six figures, Huntington, in response to a credit inquiry from IFC Credit Corporation, reported in March 2003 that Cyberco had no overdrafts. This misrepresentation substantially assisted the Principals to fraudulently obtain new loans and continue the Ponzi scheme.

69.     By the end of March 2003, Huntington had extended to Cyberco a credit facility in various forms including the revolving credit line totaling over $15,000,000. Beginning in early 2003 and continuing throughout that year, Huntington employees often expressed concern regarding Cyberco's refusal to utilize to any significant degree the Huntington lockbox for collection of accounts receivable of Cyberco. Nonetheless, at no time during 2003 did Huntington actually require Cyberco to utilize the lockbox exclusively, or even primarily, for the collection of payments from Cyberco's customers.

70.     Despite numerous requests throughout 2003 for Cyberco's 2002 audited financials, Huntington did not receive audited financials for 2002 at any time during 2003, even though its Loan Agreement with Cyberco clearly required Cyberco to provide such audited financials upon request. Shortly prior to 2003 year-end, Irwin contacted Horton and virtually begged him to provide the 2002 audited financials because his and other bank employee's bonuses could be adversely affected by this obvious breach of the Loan Agreement by Cyberco. Nonetheless, no audited financial report was provided.

71.     In a May 15, 2003, memo regarding Cyberco's equipment term loan, Hutchings again identified Teleservices as a vendor to Cyberco.  (See memo attached as Exhibit 18 and incorporated herein by reference.)

72.     In addition to the revolving line of credit, Cyberco also signed two Term Notes with Huntington, one called "Equipment Line Note" dated March 28, 2003 in the amount of $1,700,000, and the other simply called "Term Note" dated May 16, 2003 in the amount of $1,150,000.     Copies of said Notes are attached as Exhibits 19 and 20 respectively and incorporated herein by reference.

73.     In the summer of 2003, Huntington discovered what it believed was an elaborate check kiting scheme undertaken by one or more of the Principals.    Its belief was perfectly justified because the Principals were indeed engaged in check kiting in the summer of 2003.  In a later Huntington memo dated April 10, 2004, attached as Exhibit 21 and incorporated herein by reference, the following summary is found at the bottom of the second page:

> "From the phone conversation w/Gail White – first learned of suspected problem in July.  Multiple checks to account are from Silicon Valley Bank in Santa Clara California.  First thought it was an elaborate kite.  Checks ranged from several hundred thousand to $1 million."

74.     In response to this legitimate concern about a check kiting scheme, rather than conduct an investigation to get to the bottom of the fraud, Huntington advised Cyberco that it would simply no longer pay on uncollected funds.  As a result, virtually all future transfers were made via wire, which protected the bank, but allowed the fraud to continue.  See Exhibit 21.

75.     On September 5, 2003, in response to a credit inquiry from Commerce Bank regarding Cyberco, Hutchings reported to Commerce Bank that Cyberco's deposit accounts were being handled as agreed, notwithstanding the fact that before this date, Huntington had repeatedly noted that Cyberco was not using the required lockbox to any significant degree. (See

Huntington credit report attached hereto as Exhibit 22 and incorporated herein by reference.) This misinformation provided by Huntington further enabled the Principals to continue their Ponzi scheme and defraud Commerce Bank, along with additional future victims.

76.     By October 8, 2003, Cyberco was again overdrawn on two of its Huntington accounts in a total amount exceeding $78,000.  When notified of the overdraft, Kalb told Hutchings via e-mail, "Here we go again.  Please advise or resolve ASAP."  Once again, Huntington honored the overdrafts and failed to require compliance with their loan agreements, most importantly relating to use of the lockbox.

77.     On October 31, 2003, Huntington extended Cyberco's revolving line of credit, but only for 90 days to February 1, 2004.  (See Fifth Amendment to Loan Agreement attached as Exhibit 9.)

78.     Ten days later on November 10, 2003, Huntington agreed to a Sixth Amendment to the Loan Agreement (Exhibit 10) increasing Cyberco's credit limit on the Revolving Line of Credit from $13,000,000 to $14,000,000 until December 21, 2003.

79.     Without the loan extension and increased line of credit granted by Huntington, the Principals would not have been able to perpetuate and expand the scope and extent of their fraudulent activities, further loot the assets of Cyberco and hide their prior mismanagement of the company.  *In fact, Horton described Huntington's several loan extensions beginning on October 31, 2003 as the "engine" that allowed the Principals to continue and expand the Ponzi scheme, which would have collapsed almost immediately without Huntington's continued funding.*

80.     In  November and December 2003, wire transfers from Teleservices in excess of $11,000,000 were deposited into Cyberco's account at Huntington. Pursuant to the Loan and

Security Agreements with Huntington, these deposits were swept daily and applied on the credit line and re-advanced as requested on a daily basis.

81. On December 3, 2003, Kalb wrote to Hutchings reporting on the results of his investigation of Watson as he and Hutchings had discussed in mid-November. This investigation included a search for fraud records and criminal violations relating only to Watson.

82. Kalb reported in his December 3, 2003 memo to Hutchings that "no fraud records found" and "no felony or misdemeanor convictions were found." The report Kalb apparently requested was inexplicably limited to just Watson, not Cyberco, even though Cyberco was the bank's borrower. The report was further limited to just Kent County and Western District of Michigan court records, even though Watson was known to have previously worked and lived outside Michigan. Had Huntington's request simply included the name of its borrower, Cyberco, it would have discovered the fraud judgment described in paragraph 15 above.

83. On December 5, 2003, Hutchings e-mailed Kotlarz in reference to a meeting they had prior to Thanksgiving. In an attachment to that e-mail, Hutchings identified several "open issues" including "written explanation of Teleservices Group, Inc.," "the final audit for 2002," "limited use of HNB lockbox," and "internal controls established to prevent overdrafts from occurring in the future." (See Exhibit 23, attached hereto and incorporated herein by reference.)

84. Upon information and belief, one or more Huntington employees received year-end bonuses reflective of their performance during the year and the revenue generated by accounts originated or managed by these individuals. Upon information and belief, the hundreds of thousands of dollars in revenues generated by Cyberco for the bank during 2003 were part of the consideration for bonuses paid to Huntington personnel working on the Cyberco account in 2003. Prior to the end of 2003, Huntington did not make any attempt to terminate the banking

relationship with Cyberco and did not require compliance with the basic provisions of its loan documents. In fact, for the year 2003, Cyberco was one of Huntington-West Michigan's largest credit accounts.

85.     Immediately following the 2003 year end, Kalb attended a meeting with John Irwin ("Irwin"), Senior Vice President of Commercial Lending, Huntington Bank West Michigan, Cal Hekman ("Hekman"), the originating loan officer on the Cyberco account, and Hutchings relating to Cyberco. According to a January 9, 2004 e-mail from Kalb to Jim Dunlap ("Dunlap"), President, Huntington Bank West Michigan attached as Exhibit 24 and incorporated herein by reference:

> John Irwin, Cal Hekman, Kelly Hutchings, and I [John Kalb] had a meeting relating to Cyberco and *despite the "good numbers," the "red flags" continue*. It is our joint conclusion that we should exit the account and I give the team credit for taking this step despite outward financial performance. *If there is one thing that has been clear about recent times it is the heightened risk of financial misinformation (as well as fraud)* and we need to be cognizant of that fact as we see these red flags. . . . **Here is hoping we don't lose money in the process.** (Emphasis added)

The last sentence of the above e-mail became the single guiding principle for the remaining ten months of the relationship between Huntington and Cyberco. So long as Huntington was reducing its Cyberco exposure, the "red flags" observed by Huntington would not be acted upon.

86.     By January 16, 2004, Kalb had informed Dick Witherow ("Witherow") of Huntington of the decision to require Cyberco to find a new bank. In an e-mail from Witherow to Kalb, Witherow, who was less familiar with the Cyberco history, asked "Why are we asking this company to leave. Do we suspect any serious problems or are we just being cautious. The fact that we don't have an audit for 2002 is concerning."

87.     In response to Witherow's question, Kalb stated in a reply e-mail:

> *Despite the fact that this client has appeared to perform well since day one, there has [sic] **always** been red flags associated with it* (overdrafts, nature of business, tight control, etc.) . . . . But I give the team credit – these delayed f/s and some concern that we have with the type of deposits coming into the lockbox (mostly from other banks) were straws that broke the camel's back – despite the fact that we are probably wrong (I hope we are wrong) and exiting will cost income, we all agreed to exit the account. *So we have no "demonstrable" financial reason to be worried but we are anyway.* (Emphasis added)

See e-mails attached as Exhibit 25 and incorporated herein by reference.

88.     Several days later, on January 20, 2004, Witherow asked Kalb if anyone from Huntington had had "direct conversations with the accountants as to the reason for the audit delay?" Kalb acknowledged that no one had ever spoken to the accountants directly. (See e-mails attached as Exhibit 26 and incorporated herein by reference.)

89.     On February 1, 2004 Huntington again extended Cyberco's line of credit for an additional three months. (See Seventh Amendment to Loan Agreement, Exhibit 11) While this loan extension allowed Huntington to achieve a loan payoff of over $14 million, it also enabled the Principals to continue and accelerate their fraud on numerous creditors over the following nine months and allowed them to further bury Cyberco in debt while looting corporate assets.

90.     Notwithstanding the Principals' refusal to utilize the lockbox, the repeated six and seven figure overdrafts, written and oral concerns voiced about misinformation and "red flags," failure to provide audited financials for over a year, and the decision already made by the bank to force Cyberco to leave Huntington, on February 12, 2004, Huntington's Vice President, Glenn Getschow, provided a blanket credit reference for Cyberco as follows:

> To Whom It May Concern:  As of February 12, 2004, the CyberNET Group accounts with Huntington National Bank are in good standing.

This ringing endorsement of Cyberco by Huntington lent an aura of credibility to Cyberco that facilitated the ongoing solicitation of new victims for the Principals' fraud.

91.     During the course of its relationship with Cyberco, Huntington periodically calculated for Cyberco (and other commercial borrowers) an "Obligor Rating Grade" or "ORG" score which rates the borrower on a scale of 1 to 11; 1 being a superb credit and 11 being a very troubled credit. This score is typically updated throughout the life of the credit. A raw score based solely on financial information provided by Cyberco and available to the bank is first calculated using a mathematical formula. Then, an "adjustment for subjective measures," either favorable or unfavorable to the credit, is allowed to reflect, as the name suggests, subjective factors considered by the preparer of the report.

92.     Following the end of February 2004, Huntington prepared an updated "interim" ORG for Cyberco. The score produced by the financial data and formula calculations was 2.6, which was rounded up to 3, resulting in a very favorable score. (See Exhibit 27, attached hereto and incorporated herein by reference.) However, under the category of "subjective measures," the bank, citing the more glaring non-compliances by Cyberco which had been apparent to Huntington for over a year, downgraded the ORG from 3 to 9 (i.e., a very poor score). The explanation for the dramatic subjective downgrade, endorsed by regional management, reads:

> *Although the financials appear strong, bank management has limited faith in company prepared statements, and customer has refused to obtain audited statements per loan agreement.*

> \*   \*   \*

> *As noted above, the company appears financially strong, but the bank has not had a comfort level with the customer which equates to the exposure.* Because of this, regional management has chosen to apply an ORG of 9 to the credit, with which this officer will not dispute." (Emphasis added)

93.     On March 26, 2004, Hutchings e-mailed a list of questions to Horton regarding various aspects of Cyberco's operations. A copy of this e-mail is attached hereto as Exhibit 28

and incorporated herein by reference. Hutchings noted that "many of these items have been requested in the past. Those items have been highlighted." The list of questions included:

- **The final audit of 12/31/2002 and a status update for the 12/31/2003 audit.**

- A written explanation as to why you are not utilizing the HNB lockbox to any significant degree and whom is collecting most of your accounts receivable and why is that money not being transferred into HNB to paydown the line of credit.

- **A written explanation of Teleservices Group, Inc., and why do they appear to be the primary funding source of the HNB accounts.** (Emphasis in original)

94.     Watson responded to Hutchings' questions in a March 29, 2004 e-mail to Irwin, a copy of which is attached as Exhibit 29 and incorporated herein by reference. Watson did not answer any of the questions raised by Hutchings in her March 26 e-mail. Notwithstanding this continued non-responsiveness, Huntington took no action to require compliance with its loan agreements, thus enabling the Principals to continue to perpetuate the fraud and victimize future lenders while Huntington benefited by reducing its Cyberco exposure.

95.     On March 31, 2004, Irwin sent an e-mail to Watson indicating that Huntington had not "been able to get our arms around the flow of receivables" and acknowledged that accounts receivable "is our major source of collateral." (See March 31, 2004 e-mail attached as Exhibit 30 and incorporated herein by reference.)

96.     Also, during March 2004, Huntington made a second request for verification of some of the accounts receivable shown on Cyberco's financial statements and in an e-mail to Horton dated April 1, 2004, requested the name, address and phone number of several customers for the bank to contact. The bank was entitled to make such contacts and verifications pursuant to the parties' loan agreements without the approval or even the knowledge of Cyberco. Nonetheless, later that day, Watson e-mailed Hutchings stating:

26

"Just to clarify in a manner so that there is no confusion – under no circumstance will anyone from any financial institution be contacting any of our customers for verifications. I am appalled that anyone would even suggest such an action since customers would of course smell a rat of some kind,"

See Exhibit 31, attached hereto and incorporated herein by reference.

97.    Astoundingly, Huntington again acquiesced to Watson's outrageous chest-beating demand, allowing the fraud to continue.

98.    Some time prior to April 10, 2004, Larry Rodriguez of Huntington ("Rodriguez") was called upon to investigate Watson, Horton, Kotlarz, as well as Cyberco and Teleservices. In an e-mail dated April 10, 2004, Rodriguez noted that Teleservices had bank accounts at three different banks, Silicon Valley Bank, Fifth Third Bank, and Founders Trust, with 25 South Division, Grand Rapids, Michigan, shown as the address for Teleservices on the Silicon Valley Bank account (the same address as Cyberco), and 410 Park Avenue, New York, New York as the address for Teleservices on the Fifth Third and Founders Trust accounts. Rodriguez' e-mail also confirmed Huntington's belief that the Cyberco had been engaged in check kiting back in the summer of 2003 and that following that time, all deposits to Huntington from Teleservices were made with guaranteed funds via wire transfers. (See April 10, 2004 e-mail, Exhibit 21.)

99.    Notwithstanding rampant longstanding non-compliance with critical components of the loan agreements, on April 30, 2004, Huntington once again, in return for a fee of $32,500, extended the revolving loan until August 1, 2004 in the Eighth Amendment to the Loan Agreement attached hereto as Exhibit 12. As on prior occasions, this loan extension enabled the Principals to defraud more innocent victims with their Ponzi scheme and injure the company with deepening insolvency, looting and continued concealment of prior mismanagement. But this extension also enabled Huntington to achieve a complete payoff of Cyberco's loans over the ensuing months, while continuing to collect large sums as interest and fees.

27

100.    In an e-mail to Kotlarz and Watson dated May 5, 2004, more than eighteen months after the beginning of the credit, Hutchings attached a letter in which she reiterated the same questions Huntington had been asking Cyberco for well over a year:

> Secondly, we would request you help us understand the flow of your accounts receivable (this somewhat "piggybacks" the accounts receivable verification you had performed on our behalf). Once the receivable is created, your client then pays you via check/wire? Where then is this money being deposited/processed? It appears very little of this is being handled via your lockbox with the Bank. As we are advancing on these accounts we would like to see these payments redirected to the Bank so we can see the cash flow cycle completed.

See May 5, 2004 e-mail attached as Exhibit 32 and incorporated herein by reference.

101.    Following Watson's refusal to allow Huntington to verify Cyberco's accounts receivable directly with its purported U.S. customers, in direct contravention of Cyberco's agreements with the bank, Watson and the bank agreed that an accountant chosen *by Watson*, Grant Thorton *of Hong Kong*, would verify accounts receivable. Even after this agreement was reached, Emig told numerous officers and employees at Huntington that "I still find it strange that the company [Cyberco] has such an aversion to a bank ABL [asset based lending] audit process. I understand they had 'perception' issues with an audit from a prior lender. That said, we've never seen this level of concern over a field exam before." In a second e-mail dated the same date, Emig indicated that the Grant Thorton verification was "not a substitute for a field exam. . ." (See Exhibit 33 attached and incorporated herein by reference).

102.    On or about May 13, 2004, Huntington received a Grand Jury Subpoena dated April 29, 2004 requiring Huntington's Custodian of Records to testify before a grand jury relating to the criminal investigation of Cyberco and to produce to the grand jury numerous financial records of Cyberco, as indicated in the Subpoena, a copy of which is attached as Exhibit 34 and incorporated herein by reference. Huntington received a second Grand Jury

Subpoena dated May 25, 2004 requesting additional records relating to Cyberco. (See Exhibit 35 attached hereto and incorporated herein by reference.)

103.  In a memorandum dated June 8, 2004 from Horton to Hutchings and Hekman, attached as Exhibit 36 and incorporated herein by reference, Horton describes the functioning of Teleservices as an entity distributing money between and among Cyberco and its related offshore entities and funding "headquarters expenses." This description of Teleservices was directly contrary to information already in the possession of Huntington which had identified Teleservices as a vendor of computer equipment leased by Cyberco, including the equipment which was subject to the Key Bank leases purchased by Huntington (see Exhibits 1, 2 and 14). As observed by Huntington, since the inception of Cyberco's loan, Teleservices had been the primary source of revenue to Cyberco even though Huntington had no explanation why Teleservices, *a vendor*, would be paying millions of dollars *to* Cyberco.

104.  Notwithstanding the numerous violations of the loan agreements with Cyberco, as of July 2004, Huntington still had not declared any default of the loan agreements. See e-mail from Steve George, Senior Vice President, Special Assets – Northwest Region ("George") to Hekman dated July 7, 2004, attached as Exhibit 37 attached hereto and incorporated herein by reference.

105.  Throughout 2004, Huntington pressed Cyberco for substantial paydowns on the outstanding indebtedness on the revolving credit loan in an effort to reduce the bank's exposure as much as possible. Shortly after receiving the second Grand Jury Subpoena in late May, Huntington, in June 2004, began receiving substantial paydowns of the outstanding revolving credit line, without corresponding re-advances. These paydowns were funded virtually entirely

by fraudulent transfers obtained from Teleservices, which in turn had fraudulently obtained the money from victims of the Ponzi scheme.

106.     Mindful of the ongoing criminal investigation of Cyberco, Huntington left in place its goal to obtain full payoff of the indebtedness by August 2, 2004.  In an e-mail from Rodriguez to Dick Harp dated July 21, 2004, a copy of which is attached as Exhibit 38 and incorporated herein by reference, Rodriguez stated, "The FBI is actively pursuing this investigation with interviews and document searches.  I have not heard anything regarding grand jury time, so at this point, I would assume that the likelihood of any indictments before August 2nd would be very slim."

107.     Beginning July 28, 2004, many of the larger pay downs in Cyberco's indebtedness to Huntington were made by delivery of checks written by Teleservices on its Silicon Valley Bank account, and made payable directly to Huntington.  These checks totaling $6,895,283.04 were applied by Huntington directly to reduce the Cyberco indebtedness.  Copies of these checks are attached as Exhibit 39 and incorporated herein by reference.

108.     In addition to Teleservices' checks issued directly to Huntington Bank, Teleservices, dating back to late 2003, made frequent and very large wire transfers of funds into Cyberco's Huntington account, which amounts were swept on a daily basis by Huntington and applied on the line of credit pursuant to its account agreements with Cyberco.  Thus, over the course of the one year preceding the filing of the Petition, these payments from Teleservices to Cyberco's Huntington account, in addition to Teleservices' direct payments to Huntington, accounted for the entire debt reduction of Cyberco's indebtedness to Huntington.  The amount of this debt reduction plus interest and fees, paid to Huntington, total approximately $17,000,000.

109.    In the one year prior to the filing of the Petition herein, Cyberco transferred to Huntington via 49 wire transfers and three checks, all from Teleservices, fraudulently obtained funds totaling $52,109,953.22. The individual transfers are itemized on Exhibit 40 which is attached hereto and incorporated herein by reference.

110.    Notwithstanding the huge payments from Teleservices to Cyberco dating back to 2003, and notwithstanding the fact that Huntington at that time understood Teleservices to be a vendor of computer equipment leased by Cyberco, Huntington did not force Cyberco to explain why Teleservices would be paying any money at all, much less tens of millions of dollars to Cyberco. Even when Huntington asked Cyberco for an explanation regarding Teleservices in December 2003, and again in March 2004, no coherent explanation for these huge payments from Teleservices to Cyberco was received by Huntington. In fact, on August 3, 2004, Huntington acknowledged that it was less concerned about the source of payments than it was about the reduction of its Cyberco exposure. As George stated in his August 3, 2004 e-mail to Kalb and Irwin, "Given the pay-downs that have occurred on the line *from whatever sources,* I feel we should now consider pressing our position forward for our requirement of the payment of the entire debt, . . . ."

111.    Huntington received payments from Cyberco or applied third party checks as payments to reduce the indebtedness of Cyberco in the 90 days prior to the filing of the Petition herein totaling $6,131,981.48. An itemization of the payments is attached hereto as Exhibit 41 and incorporated herein by reference.

112.    With the exception of Huntington's $600,000 open letter of credit, fully secured by Watson's and Kotlarz' certificate of deposit, on October 22, 2004, the entire outstanding balance on Cyberco's line of credit was paid off. On October 22 and October 29, 2004, the two

31

Cyberco term notes were also fully paid off.  Thus, by November 1, 2004, Huntington had been fully paid for the entire indebtedness owed to it by Cyberco.  See Dunlap e-mail dated November 1, 2004, and Kalb e-mail dated November 1, 2004, copies of which are attached as Exhibits 42 and 43 and incorporated herein by reference.

113.  No later than late 2003 or early January 2004, when Huntington decided to force Cyberco to exit Huntington and pay off its outstanding indebtedness to Huntington, Huntington was aware of numerous highly unusual circumstances as set forth in this Complaint, all of which were sufficient to provide Huntington with knowledge that the Principals were engaged in fraudulent and illegal conduct and were obtaining monies through such fraud and illegal conduct.

114.  No later than late 2003 or early January 2004, when Huntington decided to force Cyberco to exit Huntington and pay off its outstanding indebtedness to Huntington, Huntington should have known, and recklessly disregarded evidence that the Principals were engaged in fraudulent and illegal conduct and were obtaining monies through such fraud and illegal conduct.

115.  On November 17, 2004, the FBI entered the Cyberco business premises at 25 S. Division with search warrants and seized numerous files and documents.

116.  On December 9, 2004, an involuntary petition in bankruptcy was filed against Cyberco.

### COUNT I
### AIDING AND ABETTING FRAUD

117.  Plaintiff repeats, as if fully set forth herein, the allegations contained in paragraphs 1 through 116 above.

118.  The Principals were, in the two years prior to November 2004, engaged in fraudulent activities for their own personal benefit and to the detriment of both Cyberco and the

creditors of Cyberco, all of whom became victims of the fraudulent activity and suffered financial losses as a result therefrom.

119.    The actions of Principals amounted to looting of the corporation to support extravagant lifestyles and to conceal their own prior mismanagement by perpetuating a Ponzi scheme, resulting in the deepening insolvency of Cyberco.

120.    By January 2004, and possibly earlier, Huntington was aware of numerous highly unusual circumstances as set forth in this Complaint, all of which were sufficient to provide Huntington with knowledge that the Principals were:

(a)     providing false and misleading financial and other information to Huntington;

(b)     obtaining money through fraud;

(c)     receiving and using fraudulently obtained and/or stolen money to make payments on Cyberco's loans from Huntington;

(d)     misrepresenting accounts receivable purportedly owed by customers of Cyberco to Cyberco;

(e)     obtaining money through Teleservices by fraudulent means and using those funds to make payments to Cyberco's Huntington accounts;

(f)     engaged in check kiting; and

(g)     otherwise engaged in fraudulent and illegal activities.

121.    Alternatively, by January 2004, and possibly earlier, Huntington should have known that the Principals were:

(a)     providing false and misleading financial and other information to Huntington;

       (b)     obtaining money through fraud;

       (c)     receiving and using fraudulently obtained and/or stolen money to make payments on Cyberco's loans from Huntington;

       (d)     misrepresenting accounts receivable purportedly owed by customers of Cyberco to Cyberco;

       (e)     obtaining money through Teleservices by fraudulent means and using those funds to make payments to Cyberco's Huntington accounts;

       (f)     engaged in check kiting; and

       (g)     otherwise engaged in fraudulent and illegal activities.

122.     Alternatively, by late 2003, and possibly earlier, Huntington recklessly disregarded evidence available to it that the Principals were:

       (a)     providing false and misleading financial and other information to Huntington;

       (b)     obtaining money through fraud;

       (c)     receiving and using fraudulently obtained and/or stolen money to make payments on Cyberco's loans from Huntington;

       (d)     misrepresenting accounts receivable purportedly owed by customers of Cyberco to Cyberco;

       (e)     obtaining money through Teleservices by fraudulent means and using those funds to make payments to Cyberco's Huntington accounts;

       (f)     engaged in check kiting; and

       (g)     otherwise engaged in fraudulent and illegal activities.

123.    Huntington provided substantial assistance to the Principals in the perpetration of Cyberco's fraud during the course of Huntington's relationship with Cyberco, including but not limited to the following:

a.      Accepting highly suspect information given by the Principals to Huntington regarding customer accounts, without ever actually verifying the accuracy of such information by contacting customers directly as expressly allowed by the loan documents over the course of the entire relationship.

b.      Continuing the relationship with Cyberco despite the persistent refusal of the Principals to meet their contractual obligations to fully or even primarily utilize the lockbox account established by Huntington for collection of all receivables of Cyberco.

c.      Accepting the highly suspect, or even non-existent, explanations given by the Principals regarding their refusal to provide audited financials without contacting Cyberco's accountant, Hiestand, directly to find out why the audited reports were not available or even to verify financial reports and tax return information provided by the Principals.

d.      Continuing the relationship with Cyberco despite the refusal of the Principals to provide Huntington with audited financials, as expressly required by contract.

e.      Paying and facilitating extended overdrafts of Cyberco beginning in December 2002, and occurring periodically thereafter in huge amounts, sometimes exceeding $1 million.

f.      Accepting the explanation of the Principals in connection with a "delayed" payment of $1.6 million by Cargill in early 2003 without contacting Cargill to verify the explanation or seeking other evidence of the purported Cargill payment.

       g.     Increasing the line of credit in January of 2003 to meet the purported need to cover the above "delayed" Cargill payment.

       h.     Conducting entirely offsite asset verifications without physically verifying the given information available at Cyberco's office.

       i.     Accepting huge payments from Teleservices to Huntington for the account of Cyberco without any plausible explanation regarding why Teleservices would be making such payments, particularly when Huntington believed that Teleservices was a supplier of computer equipment to Cyberco.

       j.     Failing to fully investigate why Teleservices was funneling eight figure sums to Cyberco's account at Huntington, from which a substantial majority of Huntington's loan paydowns were made.

       k.     Continuing the revolving line of credit despite continuous defaults almost from the inception of the loan.

       l.     Continuing the relationship with Cyberco without fully investigating the Principals' check kiting scheme, which Huntington believed existed in summer 2003, and which in fact did exist in summer 2003.

       m.     Accepting the unbelievable or lack of answers in response to many questions from Hutchings and others at Huntington directed to the Principals.

       n.     Allowing the Principals to use a hand-picked Hong Kong accountant to perform Huntington's audit of domestic receivables instead of verifying the information itself by contacting the customers directly.

       o.     Continuing and expanding the credit facility to Cyberco and covering large overdrafts during time periods when Huntington's own Obligor Rating Grade (ORG)

reports demonstrated that the bank did not believe the validity of Cyberco's financial reports provided to Huntington.

        p.     Accepting without question or investigation the validity of the large accounts receivable shown on Cyberco's accounts receivable reports owed by Teleservices and T-Resources.

        q.     Accepting large payments on Cyberco's credit line from Teleservices and the Principals on behalf of Cyberco at a time when Huntington knew that the money was stolen and/or obtained by Cyberco and/or Teleservices under false pretenses.

        r.     Providing knowingly false credit reports to Commerce Bank and IFC Credit Corporation stating that Cyberco did not have any overdrafts and that Cyberco was handling its deposit accounts as agreed upon by the parties.

        s.     Providing a satisfactory blanket credit report/reference letter to other prospective lenders after Huntington had already downgraded Cyberco's credit rating, knew of numerous serious breaches of the loan and security agreements and had asked Cyberco to leave the bank because Huntington knew Cyberco was providing the bank false and inaccurate information.

        t.     Continuing the relationship with Cyberco without verifying the existence and adequacy of Huntington's collateral under its loan agreements.

        u.     Allowing Cyberco to consistently remain noncompliant with its contractual obligations regarding the revolving line of credit and other credit facilities.

        v.     Routinely practicing atypical banking procedures applicable to asset based lending, such as the revolving credit line to Cyberco.

w.     Allowing the Principals to verify the existence of equipment subject to Huntington's and other lender's security agreements without ever conducting UCC searches to verify the information.

x.     Accepting payments from Teleservices without attempting to contact Teleservices directly, or its bank, Silicon Valley Bank, regarding an explanation for the large payments from Teleservices to Cyberco and from Teleservices directly to Huntington.

y.     Accepting without independent investigation purported customer contracts that were dated weeks after they were signed and contained nonexistent dates as verification of reported accounts receivable.

z.     Continuing to advance funds to Cyberco after May of 2004 when Huntington had received two criminal grand jury subpoenas regarding the activities of Cyberco.

aa.     Continuing to extend credit to Cyberco without a cogent explanation regarding the sources of funding funneled through Cyberco, which were not coming through the lockbox as required by the loan agreements.

bb.     Honoring and paying numerous overdrafts written by the Principals on Cyberco accounts.

cc.     Accepting one hundred percent of the pre-loan audit information to be given by Horton at an offsite location without verifying any of the information, contrary to standard banking practices.

dd.     Accepting payments directly and indirectly through Cyberco's account from Teleservices without an investigation, even after Huntington knew that Teleservices was showing two different addresses, one of which was the same address as Cyberco on South

Division Avenue, Grand Rapids, Michigan, yet knowing that the Principals had previously represented that there were no related companies such as Teleservices.

   ee. Recklessly disregarding the source of large amounts of revenue coming into Cyberco that were not passed through the Cyberco lockbox.

   ff. Allowing large overdrafts without investigation in February 2003 after Huntington described the situation as "the smoke gets thicker" and warranting "deeper investigation."

   gg. Increasing Cyberco's credit line from $9 million to $13 million in February/March 2003, when the Principals had consistently failed to abide by several of the most critical terms of the original Loan Agreement and Security Agreement.

   hh. Accepting lockbox payments without inquiring why companies making the payments did not match the identity of the customers listed on Cyberco's account receivable list.

   ii. Failing to demand an explanation from the Principals as to why the amount of payments received in the lockbox from some customers who were listed on Cyberco's A/R list did not even closely approximate the amount shown on Cyberco's accounts receivable reports as being owed by those customers.

   jj. Providing two Term Notes dated March 28, 2003 and May 16, 2003 despite the prior consistent noncompliance with the terms of the existing revolving line of credit.

   kk. Extending and increasing Cyberco's revolving line of credit in October/November 2003 despite multiple overdrafts, questionable accounts receivable, and the refusal to use the lockbox.

ll.    Again extending the revolving line of credit in February and April of 2004 despite the continued and rampant non-compliance with the loan agreements.

mm.    Otherwise failing to adhere to normal banking policies and procedures under the circumstances stated above.

124.    The above-described actions of Huntington are atypical of an asset based lender under similar circumstances.

125.    Absent the substantial assistance provided by Huntington to the Principals as set forth above, the Principals would not have been able to perpetuate and expand their Ponzi scheme of defrauding creditors and obtaining funds by false pretences.

126.    The actions of Huntington described above provided substantial assistance to the Principals in perpetuating their fraudulent activities and continuing the Ponzi scheme of defrauding the other creditors of Cyberco.

127.    By continuing to extend Cyberco's line of credit even after Huntington had decided to force Cyberco to exit the bank, and by providing the acts of substantial assistance described above, Huntington was able to reduce the total indebtedness owed to the bank by approximately $17 million while continuing to collect substantial fees and interest on the account.

128.    By continuing to extend Cyberco's line of credit even after Huntington had decided to force Cyberco to exit the bank and by providing the acts of substantial assistance described above, the fraudulent schemes of the Principals continued and artificially prolonged the existence of Cyberco, thereby deepening its insolvency, harming creditors generally who were victims of the Ponzi scheme and allowing continued looting of corporate assets and concealment of the Principals' mismanagement of assets.

129.	As a result of Huntington's conduct described above, Cyberco and all the creditors of Cyberco suffered financial injury.

130.	The actions of Huntington were a substantial factor in bringing about the injuries set forth above, and those injuries were a direct and reasonably foreseeable result of the fraudulent schemes perpetrated by the Principals and Huntington's actions aiding those schemes. Therefore, Huntington proximately caused the injuries of Cyberco and Cyberco's creditors set forth above.

131.	Huntington is liable to Thomas Richardson, as Trustee of Cyberco Holdings, Inc., for the full amount of financial injury suffered by Cyberco as a result of the fraudulent activities of Principals which were aided and abetted by Huntington, as more fully described above.

132.	Huntington is liable to Thomas Richardson, as Trustee of Cyberco Holdings, Inc., as a result of injuries suffered generally by all creditors of Cyberco who were victimized by the fraudulent activities of the Principals, which activities were aided and abetted by Huntington.

WHEREFORE, Plaintiff prays for judgment against Huntington in such amount as the Court deems just and equitable as a result of the injuries to Cyberco and the injuries suffered generally by the creditors of Cyberco, together with interest, costs, attorney's fees and such other relief as the Court deems appropriate.

## COUNT II
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

133.	Plaintiff repeats, as if fully set forth herein, the allegations contained in paragraphs 1 through 132 above.

134.	The Principals identified above owed a fiduciary duty, including a duty of loyalty and care to Cyberco, and breached these duties by engaging in fraudulent and criminal conduct for their personal benefit and to the detriment of Cyberco.

41

135.     Such conduct by the Principals resulted in the looting of Cyberco's assets by the Principals and the concealment of the Principals' prior mismanagement of the company by continuing and accelerating the Ponzi scheme.

136.     By late 2003, and possibly earlier, Huntington was aware of numerous highly unusual circumstances as set forth in this Complaint, all of which were sufficient to provide Huntington with knowledge that the Principals were breaching their fiduciary duty to Cyberco by:

(a)     providing false and misleading financial and other information to Huntington;

(b)     obtaining money through fraud;

(c)     receiving and using fraudulently obtained and/or stolen money to make payments on Cyberco's loans from Huntington;

(d)     misrepresenting accounts receivable purportedly owed by customers of Cyberco to Cyberco;

(e)     obtaining money through Teleservices by fraudulent means and using those funds to make payments to Cyberco's Huntington accounts;

(f)     engaged in check kiting; and

(g)     artificially prolonging Cyberco and deepening its insolvency; and

(h)     otherwise breaching their fiduciary duty owed to Cyberco.

137.     Alternatively, by late 2003, and possibly earlier, Huntington should have known that the Principals were:

(a)     providing false and misleading financial and other information to Huntington;

(b)     obtaining money through fraud;

(c)     receiving and using fraudulently obtained and/or stolen money to make payments on Cyberco's loans from Huntington;

(d)     misrepresenting accounts receivable purportedly owed by customers of Cyberco to Cyberco;

(e)     obtaining money through Teleservices by fraudulent means and using those funds to make payments to Cyberco's Huntington accounts;

(f)     engaged in check kiting; and

(g)     artificially prolonging Cyberco and deepening its insolvency; and

(h)     otherwise breaching their fiduciary duty owed to Cyberco..

138.    Alternatively, by late 2003, and possibly earlier, Huntington recklessly disregarded evidence available to it that the Principals were:

(a)     providing false and misleading financial and other information to Huntington;

(b)     obtaining money through fraud;

(c)     receiving and using fraudulently obtained and/or stolen money to make payments on Cyberco's loans from Huntington;

(d)     misrepresenting accounts receivable purportedly owed by customers of Cyberco to Cyberco;

(e)     obtaining money through Teleservices by fraudulent means and using those funds to make payments to Cyberco's Huntington accounts;

(f)     engaged in check kiting; and

(g)     artificially prolonging Cyberco and deepening its insolvency; and

43

(h)     otherwise breaching their fiduciary duty owed to Cyberco.

139.    The breach of fiduciary duty set forth above artificially prolonged the existence of Cyberco, thereby deepening its insolvency.

140.    Huntington sought to artificially prolong the existence of Cyberco because the probability of full payment of all extended credit greatly increased, as evidenced by the eventual payment in full.

141.    Cyberco was harmed by artificially prolonging its existence because the Principals were able to acquire a significantly greater amount of debt that was then looted for personal expenditures and used to hide previous looting and mismanagement of assets.

142.    Cyberco's creditors were generally harmed by Cyberco's prolonged existence because the Principals were given the opportunity to perpetuate and expand the Ponzi scheme.

143.     The actions of Huntington were a substantial factor in bringing about the injuries set forth above, and those injuries were a direct and reasonably foreseeable result of the breach of fiduciary duties by the Principals and Huntington's actions aiding those breaches.   Therefore, Huntington proximately caused the injuries of Cyberco and Cyberco's creditors set forth above.

144.    Absent the substantial assistance provided by Huntington to the Principals as set forth above, the Principals would not have been able to perpetuate and expand their Ponzi scheme in breach of their fiduciary duties.

145.    The actions of Huntington described above provided substantial assistance to the Principals in perpetuating their fraudulent activities and continuing the Ponzi scheme in breach of their fiduciary duties to Cyberco.

146. Huntington is liable to Thomas Richardson, as Trustee of Cyberco Holdings, Inc., for the full amount of financial injury suffered by Cyberco as a result of the breach of fiduciary duty by Principals which were aided and abetted by Huntington, as more fully described above.

147. Huntington is also liable to Thomas Richardson, as Trustee of Cyberco Holdings, Inc., as a result of injuries suffered generally by all creditors of Cyberco Holdings, Inc. who were victimized by the breach of fiduciary duty of the Principals, which activities were aided and abetted by Huntington.

WHEREFORE, Plaintiff prays for judgment against Huntington in such amount as the Court deems just and equitable as a result of the injuries to Cyberco and the injuries suffered generally by the creditors of Cyberco, together with interest, costs, attorney's fees and such other relief as the Court deems appropriate.

## COUNT III
## STATUTORY CONVERSION

148. Plaintiff repeats, as if fully set forth herein, the allegations contained in paragraphs 1 through 147 above.

149. By January 2004, Huntington knew that money paid to it by Cyberco and/or paid by Teleservices and applied to Cyberco's credit line was money that was stolen, embezzled or converted.

150. Alternately, by May 2004, Huntington knew that money paid to it by Cyberco and/or paid by Teleservices and applied to Cyberco's credit line was money that was stolen, embezzled or converted.

151. Alternately, by July 2004, Huntington knew that money paid to it by Cyberco and/or paid by Teleservices and applied to Cyberco's credit line was money that was stolen, embezzled or converted.

152.    Notwithstanding such knowledge, Huntington accepted such payments, thereby ultimately reducing the outstanding indebtedness owed by Cyberco to Huntington.

153.    Huntington's receipt of stolen, embezzled or converted funds is in violation of MCL 600.2919a, for which Plaintiff is entitled to recover three times the amount of actual damages sustained, plus costs and reasonable attorney's fees.

154.    Plaintiff has been damaged to the full extent of each and every payment received by Huntington from Cyberco and/or Teleservices at a time when the bank knew that such payment was made with stolen, embezzled or converted funds.

WHEREFORE, Plaintiff prays for a judgment against Huntington in an amount three times the sum of all payments received by Huntington from Cyberco and/or Teleservices on or after the date when Huntington knew that such payments were made with stolen, embezzled or converted funds, together with interest, costs, attorney's fees and such other relief as the Court deems appropriate.

## COUNT IV
## CONSTRUCTIVE TRUST/UNJUST ENRICHMENT

155.    Plaintiff repeats, as if fully set forth herein, the allegations contained in paragraphs 1 through 154 above.

156.    By January 2004, and possibly earlier, Huntington was aware of numerous highly unusual circumstances as set forth in this Complaint, all of which were sufficient to provide Huntington with knowledge that the payments received directly by Huntington and applied to reduce Cyberco's credit balance, or received through Cyberco's account and applied to reduce Cyberco's credit balance, were made with funds fraudulently obtained or stolen by the Principals.

46

157. Alternatively, by January 2004, and possibly earlier, Huntington should have known that the payments received directly by Huntington and applied to reduce Cyberco's credit balance, or received through Cyberco's account and applied to reduce Cyberco's credit balance, were made with funds fraudulently obtained or stolen by the Principals.

158. Alternatively, by January 2004, and possibly earlier, Huntington recklessly disregarded evidence available to it that the payments received directly by Huntington and applied to reduce Cyberco's credit balance, or received through Cyberco's account and applied to reduce Cyberco's credit balance, were made with funds fraudulently obtained or stolen by the Principals.

159. Huntington obtained a significant benefit by receiving payments from Cyberco under the Loan Agreement of $52,198,046.19, in the one year preceding the filing of the Petition which were generated as a result of the fraud by Principals.

160. Huntington abused its position as Cyberco's senior lender and permitted the fraud by Principals to continue in order to enable Huntington to continue receiving paydowns on Cyberco's credit balances from ill-gotten gains, at the expense of Cyberco's estate and its other creditors.

161. Huntington received these ill-gotten gains under circumstances where it would be unjust, unconscionable, and inequitable for Huntington to be allowed to retain them.

162. As a result, a constructive trust was imposed on the ill-gotten gains Huntington received and Huntington took these ill-gotten gains as trustee for the benefit of Cyberco's estate and other creditors.

WHEREFORE, Plaintiff prays for an entry of a judgment imposing a constructive trust on the transfers set forth above authorizing the Plaintiff to recover the transfers to Huntington

under the Loan Agreement, awarding Plaintiff interest and costs, and granting such other and further relief as is consistent with equity and good conscience.

## COUNT V
### PREFERENCE PAYMENTS

163.  Plaintiff repeats, as if fully set forth herein, the allegations contained in paragraphs 1 through 162 above.

164.  Huntington received the following payments on or within 90 days before the date of the Petition in the Cyberco bankruptcy, which payments were applied toward Cyberco's outstanding loan balances owed to Huntington:

**Revolving Credit Line (#125)**

| Date | Amount |
|------|--------|
| 09/10/04 | $1,000,000.00 |
| 09/21/04 | $1,000,000.00 |
| 10/01/04 | $    18,114.12 |
| 10/08/04 | $   500,000.00 |
| 10/15/04 | $   500,000.00 |
| 10/22/04 | $     7,022.27 |
| 10/22/04 | $1,248,845.52 |

**Term Loan (#133)**

| Date | Amount |
|------|--------|
| 10/01/04 | $     4,096.77 |
| 10/01/04 | $    36,249.88 |
| 10/22/04 | $     2,055.54 |
| 10/22/04 | $        172.04 |
| 10/22/04 | $   513,695.95 |

**Term Loan (#109)**

| Date | Amount |
|------|--------|
| 09/30/04 | $     8,997.05 |
| 09/30/04 | $    41,288.31 |
| 10/22/04 | $   173,491.72 |
| 10/29/04 | $     6,209.58 |

| | |
|---|---|
| 10/29/04 | $ 989,772.70 |

The total of the above payments is $6,050,010.90.

165.    Within 90 days before the date of the filing of the petition in this matter,
Huntington received the following lease payments from Cyberco:

| Date | Amount |
|---|---|
| 09/10/04 | $ 5,087.10 |
| 09/10/04 | $ 2,072.13 |
| 10/01/04 | $ 15,880.70 |
| 10/05/04 | $ 5,087.10 |
| 10/05/04 | $ 2,072.13 |
| 10/05/04 | $ 9,576.98 |
| 11/01/04 | $ 15,880.70 |
| 11/05/04 | $ 5,087.10 |
| 11/05/04 | $ 2,072.13 |
| 11/05/04 | $ 9,576.98 |

The total of all such lease payments is $72,393.05.

166.    All of the above payments to Huntington identified in the preceding two
paragraphs were:

a.    To or for the benefit of Huntington;

b.    For or on account of an antecedent debt owed by Cyberco before such
transfer was made;

c.    Made while Cyberco was insolvent; and

d.    Enabled Huntington to receive more than Huntington would have received
if the transfer had not been made.

167.    Pursuant to 11 USC 547(b), Plaintiff may avoid the above transfers and payments
to Huntington and obtain reimbursement from Huntington in a total amount of $6,122,403.90,
plus interest, less the value of the collateral held by Huntington as security at the time of each
such payment.

WHEREFORE, Plaintiff prays for a judgment in the amount set forth in the preceding paragraph together with costs and attorney's fees and such other relief as the Court deems just and equitable, together with interest, costs, attorney's fees and such other relief as the Court deems appropriate.

**COUNT VI**
**AVOIDANCE AND PRESERVATION OF FRAUDULENT TRANSFERS**
**PURSUANT TO 11 USC 548(a)(1)(A)**

168. Plaintiff repeats, as if fully set forth herein, the allegations contained in paragraphs 1 through 167 above.

169. Within one year before the Petition Date, Cyberco made transfers ("Transfers") of its interest in property to or for the benefit of Huntington in the aggregate amount of $52,109,953.22 as more fully described in the attached Exhibit 40.

170. The Transfers were made with the actual intent to hinder, delay or defraud an entity to which the Debtor was indebted to or became indebted to after the Transfers occurred.

171. The Defendant did not take such Transfers for value and in good faith and did not give value to the Debtor in exchange for such Transfers.

WHEREFORE, Plaintiff prays for the entry of a judgment against Huntington as follows:

A. That this Court avoid the Transfers to the Defendant and accord such other relief as is appropriate;

B. That this Court enter a judgment in favor of Plaintiff and against Huntington in the sum of $52,109,953.22 or such other amount as is proven, plus costs, with interest at the federal statutory rate from the date of this Complaint until the judgment is paid in full;

C. That this Court award your Plaintiff his costs and reasonable attorney's fees incurred in connection with this proceeding;

D.      That this Court disallow any and all claims filed by the Defendant or any amounts owed to Huntington pursuant to 11 USC 502(d) until the Transfers described herein have been returned by Huntington to the estate; and

E.      That this Court order such other relief as it finds just and equitable.

## COUNT VII
## AVOIDANCE AND PRESERVATION OF FRAUDULENT TRANSFERS
## PURSUANT TO 11 USC 548(a)(1)(B)

172.    Plaintiff repeats, as if fully set forth herein, the allegations contained in paragraphs 1 through 171 above.

173.    Within one year before the Petition Date, Cyberco made Transfers which were Transfers of interest of Cyberco in property to or for the benefit of Huntington.

174.    Cyberco received less than reasonably equivalent value in exchange for the Transfers.

175.    Cyberco was insolvent on the date of the Transfers or became insolvent as a result of the Transfers.

176.    Cyberco was engaged in business or a transaction for which the property left with the Debtor was unreasonably small.

177.    Cyberco intended to incur debts that would be beyond its ability to pay as such debts matured.

178.    Huntington did not take such Transfers for value and in good faith and did not give value to Cyberco in exchange for such Transfers.

WHEREFORE, Plaintiff prays for the entry of a judgment against Huntington as follows:

A.     That this Court avoid the Transfers to the Defendant and accord such other relief as is appropriate;

B.     That this Court enter a judgment in favor of Plaintiff and against Huntington in the sum of $52,109,953.22 or such other amount as is proven, plus costs, with interest at the federal statutory rate from the date of this Complaint until the judgment is paid in full;

C.     That this Court award your Plaintiff his costs and reasonable attorney's fees incurred in connection with this proceeding;

D.     That this Court disallow any and all claims filed by the Defendant or any amounts owed to Huntington pursuant to 11 USC 502(d) until the Transfers described herein have been returned by Huntington to the estate; and

E.     That this Court order such other relief as it finds just and equitable.

**COUNT VIII**
**AVOIDANCE AND PRESERVATION OF FRAUDULENT TRANSFERS**
**PURSUANT TO 11 USC 548(a) AND 544 (b)**

179.    Plaintiff repeats, as if fully set forth herein, the allegations contained in paragraphs 1 through 178 above.

180.    11 USC 548 provides that the Trustee may avoid a fraudulent transfer that was made within one year prior to the Petition Date.

181.    11 USC 544(b) allows the Bankruptcy Trustee to use applicable state law to avoid fraudulent transfers.

182.    The Michigan Uniform Fraudulent Transfer Act, MCL 566.31, *et seq.* (the "UFTA") provides that the Trustee may avoid a fraudulent transfer if the action is brought within six years after the claims accrue (*see*, MCL 566.39).

183.    That the Transfers to the Defendant set forth in Exhibit 40 constituted a fraudulent transfer pursuant to 11 USC 548 and MCL 566.31, *et seq.* for the following reasons:

A.    No consideration was given for the Transfers;

B.    The consideration for the Transfers that were made was inadequate;

C.    The Transfers took place at a time when the Defendant was insolvent;

D.    The Transfers occurred when Cyberco believed or reasonably should have believed that it would be unable to pay its debts as they became due;

E.    The Transfers were made with the actual intent to hinder, delay or defraud any creditor of Cyberco;

F.    The Transfers were fraudulent as to creditors and should be avoided.

184.    The Defendant did not take such Transfers for value and in good faith and did not give value to Cyberco in exchange for such Transfers.

WHEREFORE, Plaintiff prays for the entry of a judgment against Huntington as follows:

A.    That this Court avoid the Transfers to the Defendant and accord such other relief as is appropriate;

B.    That this Court enter a judgment in favor of Plaintiff and against Huntington in the sum of $52,109,953.22 or such other amount as is proven, plus costs, with interest at the federal statutory rate from the date of this Complaint until the judgment is paid in full;

C.    That this Court award your Plaintiff his costs and reasonable attorney's fees incurred in connection with this proceeding;

D.    That this Court disallow any and all claims filed by the Defendant or any amounts owed to Huntington pursuant to 11 USC 502(d) until the Transfers described herein have been returned by Huntington to the estate; and

E.     That this Court order such other relief as it finds just and equitable.

## COUNT IX
## RECOVERY AND TURN OVER OF VALUE OF AVOIDED TRANSFERS
## PURSUANT TO 11 USC 542 AND 550

185.    Plaintiff repeats, as if fully set forth herein, the allegations contained in paragraphs 1 through 184 above.

186.    Upon the avoidance of the Transfers under this Complaint, the Plaintiff is entitled to recover the value of the Transfers from Huntington as an initial transferee pursuant to 11 USC 550.

187.    Pursuant to 11 USC 542, the Plaintiff is entitled to turn over the value of the avoided Transfers as property of the estate pursuant to 11 USC 541(a)(4).

WHEREFORE, Plaintiff prays for the entry of a judgment against Huntington as follows:

A.     That this Court avoid the Transfers to the Defendant and accord such other relief as is appropriate;

B.     That this Court enter a judgment in favor of Plaintiff and against Huntington in the sum of $52,109,953.22 or such other amount as is proven, plus costs, with interest at the federal statutory rate from the date of this Complaint until the judgment is paid in full;

C.     That this Court award your Plaintiff his costs and reasonable attorney's fees incurred in connection with this proceeding;

D.     That this Court disallow any and all claims filed by the Defendant or any amounts owed to Huntington pursuant to 11 USC 502(d) until the Transfers described herein have been returned by Huntington to the estate; and

E.     That this Court order such other relief as it finds just and equitable.

## COUNT X
## AVOIDANCE OF TRANSFERS PURSUANT TO 11 USC 544, ET SEQ.

188.    Plaintiff repeats, as if fully set forth herein, the allegations contained in paragraphs 1 through 187 above.

189.    Huntington may have received other Transfers that may be avoidable pursuant to 11 USC 544, 547, 548, 549 and/or applicable State Law, as may be discovered by the Plaintiff during the course of these proceedings.    The Plaintiff hereby reserves his right to amend this Complaint in accordance with the avoidance power of the Trustee as set forth in Title 11 of the United States Code to avoid any and all Transfers he has the power to avoid that become known through discovery.

WHEREFORE, Plaintiff prays for the entry of a judgment against Huntington as follows:

A.    That this Court avoid the Transfers to the Defendant and accord such other relief as is appropriate;

B.    That this Court enter a judgment in favor of Plaintiff and against Huntington in the sum of $52,109,953.22 or such other amount as is proven, plus costs, with interest at the federal statutory rate from the date of this Complaint until the judgment is paid in full;

C.    That this Court award your Plaintiff his costs and reasonable attorney's fees incurred in connection with this proceeding;

D.    That this Court disallow any and all claims filed by the Defendant or any amounts owed to Huntington pursuant to 11 USC 502(d) until the Transfers described herein have been returned by Huntington to the estate; and

      E.     That this Court order such other relief as it finds just and equitable.

Dated:  December 7, 2006          MIKA MEYERS BECKETT & JONES PLC
                                Attorneys for Plaintiffs


                               By: _____
                                  Mark A. Kehoe (P28629)
                                  Douglas A. Donnell (P33187)
                                  Ronald J. Clark (P11940)
Business Address:
900 Monroe, N.W.
Grand Rapids, MI 49503
(616) 632-8000

h:\dad\cln\cyberco\complaint.doc
12/7/2006 10:32 PM