IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| THE HUNTINGTON NATIONAL BANK, | Case No. 2:20-cv-256 |
| Plaintiff, | Judge Graham |
| v. | Magistrate Judge Jolson |
| AIG SPECIALTY INSURANCE COMPANY, et al., | |
| Defendants. | |

**OPINION AND ORDER**

The Huntington National Bank ("Huntington") fell victim to a fraudster. All told, it is out $32 million. Huntington sought to recoup some of this from its insurers, AIG Specialty Insurance Company ("AIG") and National Union Fire Insurance Co. of Pittsburg, PA ("National Union") (collectively "Defendants"). Defendants denied the claim, prompting Huntington to file the present action.

Now before the Court are two motions for summary judgment filed by Defendants, Docs. 18 and 70, a motion for summary judgment filed by Huntington, Doc. 71, and a motion filed by Huntington requesting the Court not consider Defendants' rebuttal witness' testimony for certain propositions, Doc. 76.

**I.  Background**

**A. The Fraud**

Barton Watson was trouble. He had been blacklisted by the National Association of Securities Dealers, confessed to two bank frauds, and served three years in jail for a fraud-related crime. *Meoli v. The Huntington National Bank*, 848 F.3d 716, 722 (6th Cir. 2017).

1

Huntington knew none of this in September 2002, when it agreed to provide banking services to Cyberco Holdings, Inc ("Cyberco") for which Watson served as chairman and chief executive. *See id.* at 720. Huntington initially loaned Cyberco $9 million, comprised of a revolving line of credit, a term note, and letters of credit. *Id.*; *In re Teleservices Grp., Inc.*, 444 B.R. 767, 775 (Bankr. W.D. Mich. 2011), objections overruled sub nom. *Meoli v. Huntington Nat. Bank*, No. 1:12-CV-1113, 2015 WL 5690953 (W.D. Mich. Sept. 28, 2015), rev'd in part sub nom. *Meoli*, 848 F.3d 716 (6th Cir. 2017). By 2004 the loan had increased to $16 million. *Id.*

Cyberco was a computer-services business. *Id.* at 720. It sought out financing companies to assist it in obtaining computer equipment. *Id.* The financing companies would pay the requested funds directly to Cyberco's vender, Teleservices Group, Inc. ("Teleservices"). Report and Recommendation of Bankruptcy Judge Hughes, Doc. 18-5 at 5. Teleservices would then create invoices to document the sale of computer equipment to Cyberco. *Id.* As one would expect, Cyberco's physical location contained numerous computers with serial numbers that corresponded to Teleservices's invoices. *Id.*

Huntington noticed something was not quite right with Cyberco around September 2003. First, Huntington observed that Cyberco had deposited a series of large checks from Teleservices. *Meoli*, 848 F.3d at 720-21. Watson explained that away, asserting that Teleservices was a recent addition to Cyberco's holdings and it was collecting Cyberco's receivables.[1] *Id.* at 721. Next, Huntington did not receive an audited financial statement from Cyberco as was required under the loan agreement. *Id.* Finally, Huntington found an obvious discrepancy in Cyberco's receivables aging report. Cyberco listed competing computer services companies as its debtors. *Id* at 721-22.

---

[1] This explanation is inconsistent with Cyberco's assertion that Teleservices was its vender, but Huntington did not notice.

These compounding red-flags prompted Huntington to have its regional head of security investigate Watson and Cyberco. The head of security found Watson's history of fraud and that the FBI was investigating Cyberco, but did not share this information with the Huntington employees managing Cyberco's account. *Id.* Instead, Huntington and Cyberco continued business as normal.

On October 29, 2004, Cyberco paid off its debt to Huntington. Huntington's relief at being repaid is best captured by the remarks of one of its employees: "All I can say is 'whew'!!" *Id.*

Huntington had good reason to be relieved. The computer equipment Cyberco purported to purchase from Teleservices did not exist. Doc. 18-5 at 5. The documentation supporting the purchases was fabricated. *Id.* And Cyberco's physical location contained fake servers on which serial numbers were swapped as necessary for each inspection. *Id.* Teleservices was a paper company that acted through Cyberco's executives, who assumed fake names for their fake Teleservices jobs. *Meoli*, 848 F.3d at 720. It had no separate officers, directors, or employees. *Id.*

The scheme was simple. Cyberco would obtain loans to purchase computer equipment from Teleservices. *Id.* Teleservices would fabricate the transactions and, instead of providing computer equipment, transfer the loan proceeds into Cyberco's Huntington account. *Id.* Cyberco would then dip into those proceeds to pay down some of its prior loans and pay handsome salaries to the fraudsters. *Id.* While Huntington was ultimately repaid, many other lenders incurred significant losses.

The FBI raided Cyberco's offices later in 2004. *Meoli*, 848 F.3d at 722. Watson committed suicide shortly thereafter. *Id.*

3

B. **The Underlying Litigation**

Cyberco and Teleservices were bankrupt. A trustee[2] was appointed for the companies' estates and bankruptcy proceedings were commenced. The trustee felt an injustice occurred. He believed that Huntington put its desire to be repaid ahead of its concerns that Watson was committing a Ponzi scheme and, by doing so, perpetuated the Ponzi scheme to its benefit and other lenders' detriment. *See* Cyberco Adversary Proceeding Complaint at ¶ 2, Doc. 18-1. The trustee filed adversary proceedings against Huntington on behalf of the Cyberco and Teleservices estates on December 8, 2006 and January 19, 2007, respectively. Doc. 18-1; Teleservices Adversary Proceeding Complaint, Doc. 18-2. Both complaints included allegations of fraudulent transfers and sought recovery of those transfers from Huntington.

In June 2012, focus shifted onto the Teleservices adversary proceeding. The estates agreed to share the costs of litigation and stipulated that the recovery of either proceeding would be divided among them. *See* Trustee's Mot. To Approve Stipulation and Agreement, Doc. 70-9. The Cyberco adversary proceeding was dismissed pursuant to stipulation of the parties.

The Bankruptcy Court engaged in lengthy proceedings consisting of two trials and numerous opinions. A key issue addressed by the Bankruptcy Court is the recoverability of the transfers Huntington accepted. *See In re Teleservices Grp., Inc.*, 444 B.R. at 786. The trustee sought to recover money Teleservices transferred into Cyberco's Huntington account totaling approximately $73 million. *Id.* at 786. Huntington argued the transfers are not recoverable because it accepted them in good faith. The Bankruptcy Court concluded that Huntington established its good faith only for transfers received before April 30, 2004. *Id.* at 830 Therefore, it found the

---

[2] Initially one trustee represented both the Cyberco and Teleservices estates. Later, a separate trustee was appointed to represent the Teleservices Estate. *In re Teleservicse Group, Inc.*, 444 B.R. at 786 n.71).

4

transfers Huntington accepted after that date are recoverable. Ultimately, the Bankruptcy Court found that the trustee could potentially recover $72 million. Doc. 18-5 at 33.

The Bankruptcy Court's proceedings collimated in a report and recommendation, Doc. 18-5. The district court reviewed the report and recommendation and addressed objections brought by Huntington and the trustee. It ultimately overruled the objections and adopted the report and recommendation in full. *Meoli*, 2015 WL 5690953, rev'd in part sub nom. *Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716 (6th Cir. 2017).

Huntington appealed to the Sixth Circuit. The Sixth Circuit affirmed the Bankruptcy Court's conclusion that Huntington did not act in good faith by accepting transfers after April 30, 2004. *Meoli*, 848 F.3d at 730. However, it took a more nuanced view of which transfers are recoverable. *Id.* at 724. It noted that the Bankruptcy Court considered all transfers regardless of whether the money was paid to Huntington towards Cyberco's debt or merely placed into Cyberco's Huntington account. *Id.* It concluded that the Bankruptcy Code permits recovery only of the transfers actually paid to Huntington. *Id.* at 725. The Sixth Circuit also concluded that the trustee may be able to recover payments made as early as September 25, 2003 if Huntington had knowledge of the voidability of the transfers as of that date, an issue it expected to be decided on remand. *Id.* at 730. Finally, the Sixth Circuit invited the Bankruptcy Court to apply a different interest rate on remand to account for any possible profit Huntington made from holding the money. *Id.* at 736.

On remand, Huntington argued its liability was limited to the repayments Huntington received after April 30, 2004, $12,821,897.07 plus interest. Huntington's Remand Brief, Doc. 70-1 at 8. The trustee argued that Huntington was liable for all loan repayments after November 16, 2003, nearly $36 million plus interest. Trustee's Remand Brief, Doc. 70-2 at 38. In March 2018,

5

Huntington settled with the Teleservices trustee for $32 million. The settlement funds were disbursed 75% to Teleservices' estate and 25% to Cyberco's estate. Docs. 70-4, 70-5.

### C. The Policy

Huntington possessed a professional services policy issued by AIG for the period of January 1, 2007 to January 1, 2008 (the "Primary Policy"). The Primary Policy, Doc. 70-6. It provided coverage up to $15 million, with a $10 million retention. *Id.* at 4. Any amount in excess of the Primary Policy was covered by an excess policy issued by National Union for the same coverage period (the "Excess Policy). The Excess Policy, Doc. 70-7. The Excess Policy provided $10 million in excess coverage. *Id.* at 3. The terms and conditions of the Primary Policy govern both it and the Excess Policy. *Id.* at 6; Drummond Dep. 163:12-21.

The Primary Policy covers Huntington's "Losses" "arising from a Claim first made against the Insured during the Policy Period . . . and reported in writing to the Insurer . . . for any actual or alleged Wrongful Acts of any Insured in the rendering or failure to render Professional Services." Doc. 70-6 at 6. A "loss" is defined in-part as "damages, judgments, settlements and Defense Costs . . . ." *Id.* at 7. This definition is modified by Endorsement # 7 to exclude "matters that may be deemed uninsurable under the law pursuant to which this policy shall be construed . . . ." *Id.* at 33.

The Primary Policy contains several exclusions to coverage, three of which are at issue here. These are:

> (1) The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured . . . arising out of or resulting, directly or indirectly, from any gaining of any profit or advantage to which any judgment, final adjudication, alternative dispute resolution proceeding, or any admission of any **Insured** if evidenced in a written form, establishes the **Insured** was not legally entitled . . . .

Primary Policy Clause 4 as amended by Endorsement # 10, Doc. 70-6 at 9, 36 (emphasis in original).

6

> (2) The Insurer shall not be liable to make any payment for Loss in connection with any Claim or Claims made against any insured . . . for the principal and/or interest of any unrepaid, unrecoverable or outstanding credit . . . .[3]

Primary Policy Endorsement # 7, Doc. 70-6 at 31.

> (3) Insurer shall not be liable to reimburse the insured for damages in connection with any Claim arising out of, alleging, or in any way involving, directly or indirectly . . . any loans that are owned (not sold to any investor) for more than 12 months.

Primary Policy Endorsement #5, Doc. 70-6 at 27.

### D. Huntington's Requests for Coverage

On March 13, 2007, Huntington faxed AIG a copy of the Cyberco adversary proceeding complaint and requested a coverage analysis.[4] Doc. 18-3. AIG responded by letter on April 27, 2007 asserting that "because the claim seeks the disgorgement of monies paid by Cyberco to the insured to pay down its loan balance, there can be no coverage under the policy and/or its endorsements . . . ." Doc. 18-4 at 5. It cited in support Endorsements 5, 7, and 10. *Id.*

On April 19, 2013, Huntington provided AIG an update on the litigation and attached the amended complaint and one of the Bankruptcy Court's opinions. Doc. 18-6. AIG responded by letter dated May 24, 2013 again disclaiming coverage. Doc. 18-4 at 7-13. AIG asserted that "there appears to be potential coverage under the Policy for both the Teleservices and Cyberco matters because the Wrongful Acts alleged in both matters arise from Huntington's performance of banking services to Cyberco." *Id.* at 11. However, it found that Endorsements 7 and 10 precluded coverage. *Id.* at 11-12.

---

[3] The Primary Policy contains two exceptions to this exclusion, neither of which are relevant here. *See* Doc. 70-6 at 31.

[4] Huntington's letter is dated March 12, 2007, but the fax coversheet shows that the fax was transmitted on March 13, 2007. Doc. 18-3 at 2-3.

Finally, on July 3, 2013, Huntington mailed a letter to AIG demanding the payment of $15 million. Doc. 18-8. AIG again disclaimed coverage, citing primarily Endorsement 7. Doc. 18-4 at 14-17.

### E. Procedural History

Huntington filed its complaint on January 17, 2020 asserting breach of contract and bad faith stemming from Defendants' denial of coverage. Complaint, Doc. 1. Defendants filed an answer and asserted numerous defenses. Answer, Doc. 7.

Now pending before the Court are three motions for summary judgment, Docs. 18, 70, & 71. Huntington moved for partial summary judgment. In its view, the evidence clearly demonstrates that the Primary Policy provides coverage for Huntington's loss, of which AIG was timely notified, and to which no policy-based exclusions apply. Furthermore, Huntington asserts that any perceived misrepresentations in the insurance application are impertinent under Ohio law. Accordingly, it requests summary judgment on: (1) the existence of coverage under the Primary Policy; (2) AIG's affirmative defense of lack of timely notice of loss; (3) AIG's policy-based exclusion defenses, and (4) AIG's affirmative defense based on the alleged misrepresentations in the insurance application.

Defendants assert that they are entitled to judgment as a matter of law. Doc. 70. As to the breach of contract claim, they argue that Huntington's settlement payment does not constitute a "loss" under the policy and, even if it did, Endorsements 5, 7, and 10 preclude coverage. In the alternative, Defendants argue that Huntington's claim for coverage falls under Endorsement 7's $5 million limit of liability. As to the bad faith claim, Defendants argue that the statute of limitations has expired.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

### III. Discussion

#### A. Breach of Contract

Huntington's first cause of action alleges that Defendants breached the Primary Policy and Excess Policy by "refusing and failing to provide coverage to Huntington with respect to the losses it sustained, including defense costs, related to the Adversary Proceedings, and the settlement of the Teleservices Adversary Proceeding . . . ." Doc. 1 at ¶ 86. Defendants move for summary judgment arguing that the Policy does not cover Huntington's losses and, even if it did, the losses are precluded from coverage by several exclusions. Huntington moves for summary judgment on the issues of the existence of coverage under the Policy; applicability of policy-based exclusions; Defendants' defense of lack of timely notice of loss; and Defendants' affirmative defense based on alleged misrepresentations in the insurance application.

The exclusions to coverage are dispositive and so the Court begins and ends its analysis of Huntington's breach of contract claim there. Defendants argue that four exclusions apply. These are: (1) an exclusion for uninsurable losses; (2) an exclusion for a claim seeking recovery of unpaid, unrecoverable, or outstanding credit; (3) an exclusion for a claim arising out of gaining

10

any profit to which any judgment establishes the insured was not legally entitled; and (4) an exclusion for a claim involving loans owned by Huntington for more than 12 months.

### 1. Legal Principles

The parties do not dispute that Ohio law governs the construction and interpretation of the Primary Policy. Under Ohio law, "[a]n insurance policy is a contract." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). "[T]he role of a court is to give effect to the intent of the parties to the agreement." *Id.* Courts are to apply the plain and ordinary meaning of the language used unless another meaning is clearly apparent from the contents of the policy. *Id.* (citation omitted). Endorsements are read as part of an insurance contract. *Burlington Ins. Co. v. Eden Cryogenics LLC*, 126 F. Supp. 3d 947, 955 (S.D. Ohio 2015). If an endorsement and contract conflict, the endorsement controls. *Id.*

Ohio law provides for a burden-shifting framework in insurance coverage cases. The insured bears the initial burden of proving the policy provides coverage for a particular loss. *Will Repair, Inc. v. Grange Ins. Co.*, 15 N.E.3d 386, 391 (8th Dist. Oh. 2014). Then the insurer has the burden to prove that an exclusion to coverage applies. *Id.*

### 2. Uninsurable Loss

The Primary Policy covers certain "losses." Doc. 70-6 at 6. "Loss" is defined as "damages, judgments, settlements and Defense Costs . . . ." *Id.* at 7. This definition is amended by Endorsement 8 to exclude "matters that may be deemed uninsurable under the law pursuant to which this policy shall be construed . . . ." *Id.* at 33.

As an initial matter, Defendants argue that the uninsurable loss exclusion is not an exclusion at all, but a condition for coverage. If Defendants are correct, the upshot is that

11

Huntington, not Defendants, bear the burden of proof, a burden which Defendants assert Huntington cannot meet.

Defendants' argument that the uninsurable loss exclusion is a condition of coverage has no merit. The location of exclusionary language does not change the fact that it is an exclusion. This is true even if the exclusion is within the coverage section of the contract or within the definition of "loss." *See J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 183 N.E.3d 443, 448 (N.Y. 2021), reargument denied, 184 N.E.3d 886 (N.Y. 2022) ("Here, although the policy limitation on the definition of 'loss' as exempting 'penalties imposed by law' is contained in the coverage section, the carve out excepting certain 'penalties' from coverage amounts to an exclusion because, absent that language, the definition of loss would otherwise encompass such payments."); *Astellas US Holding, Inc. v. Starr Indem. & Liab. Co.*, 566 F. Supp. 3d 879, 897 (N.D. Ill. 2021) ("The Court finds that the language is an exclusion notwithstanding the fact that it is located in the section defining 'Loss' rather than the 'Exclusions' section of the Primary Policy.").

That an exclusion is an exclusion no matter its location makes good sense. The insurer is the drafter of the policy. *Chubb Custom Ins. Co. v. Grange Mut. Cas. Co.*, No. 2:07-CV-1285, 2011 WL 4543896, at *8 (S.D. Ohio Sept. 29, 2011), modified, No. 2:07-CV-1285, 2011 WL 6371901 (S.D. Ohio Dec. 20, 2011). It is responsible for carefully drafting exclusions such that only one meaning can reasonably be attributed to it. *Id.* What is not clearly excluded from coverage is deemed to be included. *See id.* It is for this reason that the insurer bears the burden of proving the application of an exclusion. This framework would be defeated could insurers switch the burden by masquerading exclusions as conditions for coverage.

Now to the substance of the uninsurable loss exclusion. Courts frequently begin discussions of uninsurable loss with the Seventh Circuit's opinion in *Level 3 Communications, Inc. v. Federal*

12

*Ins. Co.*, 272 F.3d 908 (7th Cir. 2007). This Court will follow suit. In *Level 3 Communications*, Level 3 engaged in securities fraud by fraudulently inducing its shareholders to sell their shares. *Id.* at 910. The dispute settled and Level 3 sought for its insurer to cover the settlement. *Id.* at 909. The court found that repayment of "ill-gotten" gains is not a loss. *Id.* at 910. It reasoned that "[a]n insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return." *Id.* at 911.

This court has touched on uninsurability once before. In *Chubb Custom Ins. Co. v. Grange Mut. Cas. Co.*, Grange was subject to a class action lawsuit for its use of a computer software which underpaid insurance claims. 2011 WL 4543896, at *1. The suit settled and Grange sought indemnification from its insurer. *Id.* The insurer argued that the claim against Grange was uninsurable as a matter of law. *Id.* at *10. The court disagreed. It distinguished the wrongful retention of money, which is insurable, from the wrongful acquisition of money, which is not. *Id.* at *11. Because Grange had failed to pay money rather than wrongfully took money, the court found that the claim was for damages, not restitution, and therefore was insurable under law. *Id.* The Sixth Circuit has noted the validity of *Chubb*'s distinction in a case applying Michigan law. *William Beaumont Hosp. v. Federal Ins. Co*, 552 F. App'x 494, 499-500 (6th Cir. 2014).

Huntington argues that the above cases are inapplicable because disgorgement payments are insurable under Ohio law. However, it offers no persuasive authority to support this assertion. It relies on cases applying Delaware law, where only claims specified by statute are uninsurable. *See, e.g., Sycamore Partners Management, P.P. v. Endurane American Insurance Company,* 2021 WL 761639, *11 (Del. 2021) ("But in Delaware, losses are uninsurable as-against public policy only if the legislature so provides."). Ohio has no analogous rule. And while no Ohio court has

addressed whether disgorgement is insurable, the Court finds that Ohio courts are unlikely to permit insurance coverage for wrongfully obtained money.[5]

The next contested question is whether the repayment of fraudulent transfers accepted without good faith constitutes unlawful taking of money or unlawful holding of money. Huntington argues for the latter. In its view, it had a contractual right to be repaid on its loan to Cyberco. That the Bankruptcy Court determined the loan payments were fraudulent transfers, it argues, means only that the money was wrongfully held.

The Fifth Circuit encountered a similar situation in *In re TransTexas Gas Corp*, 597 F.3d 298 (5th Cir. 2010). In *TransTexas*, a bankruptcy court found the severance payment made to an outgoing chief executive officer of a bankrupt company was an unlawful preference and fraudulent transfer. *Id.* at 303. The company's insurer sought declaratory judgment that it was not liable under the policy for the judgment. *Id.* It was argued that the severance payment was insurable because the chief executive officer had a contractual right to the severance payment at the time he received it. *Id.* at 310. The court rejected this argument, concluding that "[p]ayments fraudulent as to creditors that must therefore be repaid due to bankruptcy court order is a disgorgement of ill-gotten gains and a restitutionary payment." *Id.* at 310.

The Court finds *TransTexas* persuasive. While Huntington had the contractual right to be repaid on its loan, it did not have the right to accept payments from the bankrupt Cyberco and Teleservices without good faith and to the detriment of the other victims of the fraud. Doing so

---

[5] Huntington also asserts that Defendants' uninsurable loss exclusion is inapplicable because it does not specifically exclude claims for disgorgement. The loss exclusion need not explicitly exclude disgorgement, however, because the Court finds that disgorgement is uninsurable under Ohio public policy.

14

was wrongful. And because it was wrongful, the Bankruptcy Court, district court, and Sixth Circuit ordered the transfers be unwound.

In sum, the Court finds that Huntington's acceptance of loan payments without good faith constitutes the wrongful taking of money and is uninsurable.

This is not the end of the analysis. Huntington argues that even if the uninsurable loss exclusion precludes coverage, Defendants are not entitled to summary judgment because they have not shown the uninsurable claim was the basis for or increased the amount of the settlement.

Where a settlement has insured and uninsured components, the total of the settlement is allocated among each component to determine the amount of insurance coverage. There are two methods of allocating settlements – the larger settlement rule and the relative exposure rule. *Owens Corning v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 257 F.3d 484, 492 (6th Cir. 2001). The larger settlement rule allows allocation of the costs of settlement "only where that settlement is larger because of the activities of uninsured persons who were sued or persons who were not sued but whose actions may have contributed to the suit." *Id.* (quoting *Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d 955, 960 (7th Cir.1995)). In other words, coverage can be denied only in the amount the uninsured conduct increased the settlement. The relative exposure rule "allocates a settlement based on comparing the potential exposure of the uninsured and insured defendants had the litigation proceeded." *Id.* (citing *Caterpillar*, 62 F.3d at 961).

Generally, allocation of settlements occurs between insured and uninsured claims or actors. For example, in *Owens Corning* the dispute was whether the settlement could be allocated by the misconduct of the company's directors, which was insured, and the misconduct of the company, which was not. *Id.* at 491-93. Huntington asserts that its settlement should be allocated by something altogether different – the motivation for settlement. It asserts that even if the repayment

15

of transfers is not covered by the Primary Policy, its other motivations for settlement may be covered. It contemplates that it may have settled for any number of reasons beyond the concern of repaying the transfers, including the remaining issues on remand (excess deposits and prejudgment interest) and general concerns regarding publicity, litigation costs, and resource management.

The Court will not expand the concept of settlement allocation in the way Huntington suggests. The Court's duty in a diversity jurisdiction case involving Ohio law is to anticipate how the Ohio Supreme Court would rule if presented with the facts here. *Mahne v. Ford Motor Co.*, 900 F.2d 83, 87 (6th Cir. 1990). Huntington has presented no case law to suggest that any court applying Ohio law would allocate a settlement by motive, nor has this Court found any. Here, the settlement was to resolve the Teleservices adversary proceeding. The subject of that proceeding was the recovery of illegal transfers, which is uninsurable. Therefore, none of Huntington's settlement is covered by the Primary Policy.

Even were the Court to entertain allocating a settlement by motive, Huntington's argument fails. Huntington asserts that it may have settled to avoid potentially insurable open issues on remand, specifically excess payments and prejudgment interest. This is patently false. The "excess payments" issue is a red herring. It refers to the money deposited into Cyberco's Huntington account which Huntington, pursuant to its agreement with Cyberco, automatically applied towards the line of credit debt. The Sixth Circuit did not address these payments. Defendants raised on remand that under the Sixth Circuit's framework, the payments are recoverable. S*ee* Doc. 71-2 at 344-48. Defendants are correct. But more importantly, the automatically applied payments, just as the payments paid directly towards the loan by Cyberco and Teleservices, were wrongfully obtained and are uninsurable.

16

The prejudgment interest is likewise uninsurable. The Sixth Circuit allowed the Bankruptcy Judge to consider increasing the prejudgment interest rate to take account of any profit Huntington may have incurred from holding and investing the illegal transfers. *Meoli*, 848 F.3d at 736. Whatever prejudgment interest rate the Bankruptcy Court may have imposed therefore also constitutes uninsurable disgorgement.

Finally, Huntington's argument that it may have settled due to general concerns such as publicity, litigation costs, and resource management is contradicted by record evidence. Huntington settled for $32 million after over a decade of litigation and with a clear understanding of its basis of liability. Huntington's general counsel, Jana Litsey, explained: "I was seeking a global settlement. There was no allocation between any claim associated with exposures in the case." Litsey Dep. 89:15-18. She sought settlement because:

> I was concerned about how the bankruptcy court would review and handle that claim on remand, I was concerned about the Sixth Circuit's invitation and the trustee's request; that the court – the bankruptcy court on remand increased the amount of prejudgment interest to account in some measure for Huntington's perceived profit. . . . [W]e could be on the hook going back to a court that didn't – you know, didn't show us any love.

*Id.* at 88:11-18, 89:20-22. And after settlement, when Huntington sent AIG a final request for coverage, it did not assert any additional motives for settling. Instead, it merely attempted to rebut Defendants' prior reasons for denial.

### 3. Recovery of Unrepaid, Unrecoverable, or Outstanding Credit

Even if Huntington's loss was fully or partially insurable, a separate exclusion precludes coverage. The Primary Policy provides that with respect to the Insured's performance of Lending Acts:

> [t]he Insurer shall not be liable to make any payment for Loss in connection with any Claim or Claims made against any Insured . . . for the principal and/or interest of any unrepaid, unrecoverable or outstanding credit . . . .

17

Doc. 70-6 at 31. "Lending Act" is defined as "any act performed by an Insured for . . . a customer or client of the Company relating to an extension of credit, a refusal to extend credit or an agreement to extend credit . . . ." *Id.* at 30

Huntington argues that this exclusion is facially inapplicable. First, it argues that it did not engage in lending acts. Second, it argues that its claim is not for unrepaid, unrecoverable, or outstanding credit because the Cyberco line of credit was fully repaid.[6]

Huntington's arguments are unpersuasive. Huntington extended to Cyberco, among other things, a line of credit. It then accepted payments, some from Cyberco and some from Teleservices, to pay down that line of credit. Plainly, Huntington was engaging in an "act performed by an Insured . . . relating to an extension of credit," and therefore was performing a lending act under the Primary Policy. That some of the payments were made by Teleservices is irrelevant; the fact that Huntington was engaging in an act for a customer (accepting payments on Cyberco's line of credit) remains the same.

Further, Huntington's claims are for outstanding and unrecoverable credit. Huntington is correct that Cyberco and Teleservices paid off Cyberco's line of credit. However, the Bankruptcy Court determined that some of those payments were accepted without good faith. Therefore, it ordered that those payments be unwound, an order which the Sixth Circuit affirmed in principle. Huntington's subsequent insurance claim was, in reality, an attempt to reobtain the loan payments it was forced to return. That is, Huntington is seeking to recoup the outstanding balance of the line

---

[6] Huntington supports its interpretation of the Primary Policy with arguments about the industry's understanding of the function of similar exclusions. The Court does not consider these arguments because the exclusion is unambiguous. *See Kelly v. Medical Life Ins. Co.*, 509 N.E.2d 411, 132 (Ohio 1987) ("A court will resort to extrinsic evidence in its effort to give effect to the parties' intentions only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning.").

18

of credit which, now that Cyberco is bankrupt, is uncollectable. The Primary Policy prohibits Huntington from doing so.

### B. Bad Faith

Huntington alleges in its bad faith cause of action that Defendants' repeated denials and ultimate refusal to provide coverage with respect to the adversary proceedings lacked any reasonable justification and was not in good faith. Doc. 1 at ¶¶ 92 and 93. Defendants move for summary judgment on this claim, asserting that the statute of limitations expired well before Huntington filed its complaint.[7]

The Court does not reach Defendants' statute of limitations argument. "Where a claim for bad faith rests upon the same allegations as a claim for breach of contract and there has been no breach of contract, the bad-faith claim fails as a matter of law." *Shaut v. Nat'l Cas. Co.*, 176 N.E.3d 1122, 1134 (Ohio Ct. App. 8th Dist. 2021). Huntington's bad faith claim is based on the same allegations as its breach of contract claim and the Court has found that no breach occurred. Therefore, Huntington's bad faith cause of action fails as a matter of law.

### IV. Conclusion

For the above reasons, Defendants' motions for summary judgment, Docs. 18 and 70, are **GRANTED**. Huntington's motion for summary judgment, Doc. 71, and motion to preclude Defendants from relying on expert opinions, Doc. 76, are **DENIED AS MOOT**. The clerk shall enter final judgment in favor of Defendants with costs.

---

[7] Huntington moved for the Court to deny or defer Defendants' motion for partial summary judgment on the bad faith claim, Doc. 18, pursuant to Federal Rule of Civil Procedure 56(D). Discovery has since been completed. Accordingly, Huntington's request pursuant to Rule 56(D) is denied as moot.

**IT IS SO ORDERED**.

                                                                                  s/ James L. Graham  
                                                                                   JAMES L. GRAHAM  
                                                                                   United States District Judge

DATE: December 16, 2022