**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **The Huntington National Bank,** | : | |
| | : | **Case No. 2:20-cv-00256** |
| **Plaintiff,** | : | |
| v. | : | **Judge Graham** |
| | : | |
| **AIG Specialty Insurance** | : | **Magistrate Judge Jolson** |
| **Company, et al.** | : | |
| | : | |
| **Defendant.** | : | |

**<u>OPINION & ORDER</u>**

This matter is before the Court on remand from the Sixth Circuit Court of Appeals. Mandate, ECF No. 88. On December 16, 2022, this Court granted summary judgment for the Defendants AIG Specialty Insurance Company and National Union Fire Insurance Co. (collectively, "Defendants" or "AIG") and denied partial summary judgment for Plaintiff Huntington National Bank ("Plaintiff" or "Huntington"). Op. & Order, ECF No. 84. Huntington appealed, and the Sixth Circuit reversed and remanded the matter for further proceedings. *Huntington Nat'l Bank v. AIG Specialty Ins. Co.*, No. 23-3039, 2024 WL 374571 (6th Cir. Feb. 1, 2024). In light of the Opinion from the Sixth Circuit, and for the reasons set forth below, Defendants' *Motion for Partial Summary Judgment* (ECF No. 18) is hereby **DENIED**; Defendants' *Motion for Summary Judgment* (ECF No. 70) is hereby **GRANTED in part and DENIED in part**; and Plaintiff's *Motion for Partial Summary Judgment* (ECF No. 71) is hereby **GRANTED in part and DENIED in part**.

**<u>STATEMENT OF THE CASE</u>**

The dispute before the Court concerns whether the insurance policy at issue provides coverage for Plaintiff Huntington's settlement of bankruptcy proceedings. The bankruptcy

[1]

settlement followed an appeal, *Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716, 719 (6th Cir. 2017); the Sixth Circuit's opinion therein plays a significant role in the immediate dispute. Accordingly, and for the sake of clarity, the Court herein refers to the bankruptcy appeal as "*Meoli*" and the appeal in the instant case—the opinion remanding this matter—as "*HNB*."

For further recounting of the long history of this case, the Court turns to the Sixth Circuit's opinion in *HNB*:

> [Defendants AIG and National Union Fire Insurance, (collectively, "AIG")] issued to Huntington a bankers professional liability insurance (BPL) policy for the period of January 1, 2007 to January 1, 2008. The policy provided coverage up to $15 million, after a $10 million retention. Any liability exceeding the primary policy was covered by an excess policy issued by National Union for the same coverage period, which provided $10 million in excess coverage. The terms and conditions of the primary AIG policy govern both it and the excess policy [(collectively referred to as "the insurance Policy" or just "the Policy")]…
>
> The policy covers Huntington's "Loss ... arising from a Claim first made against the Insured during the Policy Period ... and reported in writing to the Insurer ... for any actual or alleged Wrongful Act of any Insured in the rendering or failure to render Professional Services." [ECF No. 70-6, Ins. Pol., 6.]
>
> …
>
> The policy was implicated when Huntington unwittingly became the bank for a fraudulent company, Cyberco Holdings, Inc. Barton Watson perpetuated a Ponzi Scheme through two fraudulent companies, Cyberco Holdings, Inc. and Teleservices Group, Inc. *Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716, 720 (6th Cir. 2017). From September 2002 to October 2004, Huntington served as Cyberco's bank and extended multiple loans to Cyberco, based on Watson's representation that Cyberco was a computer services business that needed capital. *Id.* Huntington initially loaned Cyberco $9 million, comprised of a revolving line of credit based on Cyberco's receivables, a term note, and letters of credit. *Id.*; *In re Teleservices Grp., Inc.*, 444 B.R. 767, 775 (Bankr. W.D. Mich.

2011), *objections overruled sub nom. Meoli v. Huntington Nat'l Bank*, 2015 WL 5690953 (W.D. Mich. Sept. 28, 2015), *rev'd in part Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716 (6th Cir. 2017). Huntington later increased Cyberco's line of credit, financed various equipment acquisitions, and issued additional letters of credit. *In re Teleservices*, 444 B.R. at 776.

Cyberco represented that it purchased computer equipment from a vendor, Teleservices. *Meoli*, 848 F.3d at 720. In reality, Teleservices was a paper company that Watson created to perpetuate his fraud. *Id.* Watson borrowed money from financing companies and instructed them to send the money directly to Teleservices, Cyberco's supposed "vendor," to pay for the computer equipment. *Id.* Once the financing companies paid Teleservices, Watson took the money from Teleservices's bank account and deposited it into Cyberco's bank account at Huntington. *Id.*

Huntington grew suspicious of Cyberco around September 2003. First, Cyberco had deposited a series of large checks from Teleservices in the months preceding September 2003. *Id.* at 720–21. Huntington asked Watson about this, and Watson explained that Teleservices was a new addition to Cyberco's holdings and that it was collecting Cyberco's receivables. *Id.* at 721. This explanation contradicted Watson's previous representation that Teleservices was Cyberco's vendor, but the Huntington employees did not know or realize this. *Id.* Second, Cyberco refused to use the lockbox that Huntington had set up. *Id.* A lockbox is a service offered by a bank by which the bank manages the check-depositing process. *Id.* Cyberco's refusal to use the lockbox blinded Huntington to Cyberco's source of money. *Id.* Third, Cyberco never gave Huntington any audited financial statements, despite the loan agreement's requirement to do so. *Id.* Fourth, Cyberco had previously overspent its deposits, and Huntington had covered the excess spending by further extending Cyberco's loan. *Id.* And finally, in April 2004, Huntington found an obvious discrepancy in Cyberco's receivables aging report, "which is a standard accounting report that lists unpaid customer invoices," in which Cyberco listed competing computer services companies as its debtors. *Id.* at 721–22.

[3]

The Huntington team responsible for Cyberco reported this to Huntington's security department. *Id.* at 722. Huntington's security department then discovered that the FBI was investigating Cyberco, that Watson had been permanently blacklisted by the National Association of Securities Dealers, and that he had confessed to and served time for fraud-related crimes. *Id.* But the Huntington security department did not share any of this with the team responsible for Cyberco. *Id.* From May 2004 to October 2004, Cyberco gradually repaid its entire loan, a relief for the Huntington team. *Id.* Later in 2004, the FBI raided Cyberco's offices, and Watson committed suicide shortly thereafter. *Id.*

Following the FBI raid, creditors of Cyberco and Teleservices, both entirely fraudulent companies, discovered that the companies were bankrupt. *See id.* at 722–23. The trustees of Cyberco and Teleservices filed adversary proceedings against Huntington, claiming that Huntington put its desire to be repaid ahead of its concerns that Watson was committing fraud and, by doing so, perpetuated the Ponzi scheme to its benefit and other lenders' detriment. Both complaints included allegations of fraudulent transfers and sought recovery of those transfers from Huntington.

The bankruptcy proceeding was long and complex, including two trials and multiple opinions. *Meoli*, 848 F.3d at 722. Under its fraudulent transfer claims, the trustee sought to recover money Teleservices transferred into Cyberco's Huntington account totaling approximately $73 million. *In re Teleservices*, 444 B.R. at 772. Huntington argued that the transfers were not recoverable because it accepted them in good faith under 15 U.S.C. § 548(c) and § 550(b)(1). *Id.* at 773.

*HNB*, 2024 WL 374571 *1-3 (footnotes omitted). In *Meoli*, on appeal from the Bankruptcy Court, the Sixth Circuit categorized the allegedly fraudulent transfers as:

"(i) direct loan repayments, which Teleservices sent directly to Huntington to pay down Cyberco's debt to Huntington; (ii) indirect loan repayments, which Teleservices sent to Cyberco's deposit account at Huntington, and which Cyberco later used to repay its debt to Huntington; and (iii) excess deposits, which

[4]

> Teleservices sent to Cyberco's deposit account at Huntington, and which Cyberco
>
> later withdrew or the government later seized."

*Meoli*, 848 F.3d 716, 719 (6th Cir. 2017).

*Meoli* held that the trustee *could not* recover the transfers in category (iii), but the trustee *could* recover the transfers in categories (i) and (ii) for which Huntington could not prove an affirmative good faith defense. *Id.* at 729. *Meoli* further held that Huntington had not proven a good faith defense as to the loan repayments it continued to receive after April 30, 2004, the date when the bank's investigator "discovered a critical clue to Cyberco's fraud," and "failed to share that discovery with Huntington's manager who oversaw the Cyberco account." *Id.* at 720. The matter was then remanded to the Bankruptcy Court for further proceedings to address the factual question of whether Huntington had "knowledge of the voidability of the transfers" received between September 25, 2003 and April 30, 2004. *Id.* at 730.

Turning again to the summary in *HNB*:

> On remand [from *Meoli*], Huntington argued it was not liable for any
> repayments before April 30, 2004, and that its liability was thus limited to the
> $12,821,897.07 in loan repayments for which this court in *Meoli* had already found
> Huntington liable. On the other hand, the trustee argued that Huntington had
> knowledge of the voidability of the transfers it received after November 16, 2003,
> making $35,968,475, plus interest, the proper recoverable amount. In March 2018,
> Huntington settled with the trustee for $32,000,000.
>
> The settlement was not an admission of liability, and the settlement
> agreement expressly disclaimed any liability, culpability, fault, or wrongdoing.
> [ECF No.] 70-3, Settlement Agr., Page ID 2653 (declaring that nothing in the
> settlement agreement is or shall be construed or deemed to be "an admission or
> concession of liability, culpability or fault, an admission or concession of the merit
> or validity of any claims asserted in connection with the Adversary Proceeding,
> each of which is expressly denied"); *see also id.* at 2661. Huntington denied "any

[5]

and all wrongdoing of any kind whatsoever on the part of itself" and any employees. *Id.* at 2653; *see also id.* at 2661.

Throughout the bankruptcy litigation, Huntington sent AIG several requests for coverage. In March 2007, Huntington sent AIG a copy of the bankruptcy summons and complaint requesting a coverage analysis. AIG denied coverage in April 2007, relying on Endorsements 5, 7, and 10. In April 2013, Huntington provided AIG an update on the litigation and attached the amended complaint and one of the bankruptcy court's opinions. AIG again disclaimed coverage, acknowledging that there was "potential coverage" under the policy because the Wrongful Acts alleged arose from Huntington's performance of banking services to Cyberco, but citing Endorsements 7 and 10 as excluding coverage. Finally, in July 2018, Huntington sent AIG a demand letter for payment of $15 million. In August 2018, AIG again disclaimed coverage, citing primarily Endorsements 7 and 8.

Huntington subsequently sued AIG, alleging breach of contract and bad faith stemming from the denial of coverage. Huntington moved for partial summary judgment, requesting summary judgment on the existence of coverage under the insurance policy. AIG also moved for summary judgment, asserting that Huntington's settlement payment was not a "Loss" under the policy and, even if it was, Endorsements 5, 7, and 10 precluded coverage.

2024 WL 374571, *4. This Court ultimately granted summary judgment for AIG. Op. & Order, ECF No. 84. Huntington appealed, challenging this Court's conclusions that: (1) Huntington's claim was uninsurable under Ohio law; (2) that Huntington's claim was independently barred by Endorsement 7, which excludes losses for "unrepaid, unrecoverable, or outstanding credit"; and (3) therefore, the larger settlement rule did not apply. *HNB*, 2024 WL 374571, *1.

The Sixth Circuit reversed this Court's judgment. *Id.* Specifically, the Sixth Circuit found error in this Court's conclusion that Huntington's claim was for disgorgement—"an attempt to reobtain the loan payments it was forced to return"—and thus was uninsurable under Ohio law

[6]

which was "unlikely to permit insurance coverage for wrongfully obtained money." ECF No. 84, 14, 18. The Sixth Circuit held that Huntington's legal entitlement to collect the loan payments, as well as the bankruptcy court's finding of only transferee liability, both operated to distinguish Huntington's claim from case law demonstrating the "quite narrow" category of conduct which is uninsurable as a matter of Ohio law. *HNB*, 2024 WL 374571, *7. The Sixth Circuit therefore concluded that "(1) Huntington's claim for insurance coverage is insurable under Ohio law, and (2) Huntington's claim should not be excluded as a claim for 'unrepaid, unrecoverable, or outstanding credit.'" *Id*. at *1. The Sixth Circuit did not opine on the application of the larger settlement rule.

## **DISCUSSION**

The parties have submitted additional briefing regarding how this Court should proceed and apply the Sixth Circuit's holdings on remand.[1] *See* ECF Nos. 91-94. The parties do not dispute that three (3) motions for summary judgment are ripe before the Court on remand: (1) AIG's motion for partial summary judgment (ECF No. 18); (2) AIG's motion for summary judgment (ECF No. 70); and (3) Huntington's motion for partial summary judgment (ECF No. 71).

AIG argues that, notwithstanding *HNB*'s holding that Huntington's claim is insurable under Ohio law, the claim is barred by exclusions set forth in Endorsement 10 and Endorsement 5, thus entitling AIG to summary judgment. Defs.' Br. 3, ECF No. 91. Alternatively, AIG argues that they are entitled partial summary judgment regarding the untimeliness of Huntington's Bad

---

[1] This Court initially requested that the parties specifically provide further briefing on Plaintiff's claim of Bad Faith, which was not substantively addressed in this Court's December 16, 2022, Opinion & Order granting summary judgment, and thus neither did the Sixth Circuit reach the claim on appeal. However, the parties each raise arguments as to additional unresolved matters, and reference their extensive briefing on these issues previously, which this Court has considered in rendering the judgment herein.

Faith claim and as to the limit of liability in Endorsement 7. *Id.* at 3-4. Finally, AIG argues that Huntington is not entitled to partial summary judgment on its remaining claims. *Id.* at 4.

Huntington argues that neither Endorsement 10 nor Endorsement 5 preclude coverage, and that the holdings in *HNB* foreclose any contrary construction. Pl.'s Reply 4-7, ECF No. 93. Huntington further argues that its Bad Faith claim was timely, and that the sublimit in Endorsement 7 is inapplicable to its claim for coverage. *Id.* at 7-8.

## STANDARD OF REVIEW

### *Summary Judgment*

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence"

to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

"This standard of review remains the same [when] reviewing cross-motions for summary judgment." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441 (6th Cir. 2021). When addressing cross-motions for summary judgment, the Court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019).

*Ohio Law – Insurance Contracts*

Because this Court's jurisdiction to hear this case rests upon the diversity of the parties, Ohio law governs the dispute. *Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.*, 57 F.4th 558, 561 (6th Cir. 2023). An insurance dispute such as that before the Court presents an issue of contract interpretation. *Nationwide Mut. Ins. Co. v. Marsh*, 15 Ohio St. 3d 107, 109, 472 N.E.2d 1061, 1062 (1984). "[A]n insurance policy is a contract, and that the relationship between the insurer and the insured is purely contractual in nature." *Id.* Ohio law has long held that "where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 519 N.E.2d 1380, 1383 (Ohio 1988). Finally, "Where exceptions, qualifications, or exemptions have been added to an insurance contract, there is a general presumption that anything not clearly excluded by such provisions is included in the insured's coverage." *HNB*, 2024 WL 374571, at *6.

[9]

## I.     Defendants' Motion for Partial Summary Judgment

AIG filed its first motion for partial summary judgment on December 11, 2020, solely with respect to Count II of Huntington's Complaint, which charges AIG with Bad Faith Denial of Coverage. Defs.' Mot. Summ. J., ECF No. 18. AIG argues that it is entitled to summary judgment because a claim for Bad Faith Denial of Coverage is subject to a four-year statute of limitations and is thus time-barred. *Id.* The Court notes, however, that AIG's motion does not attack the merits of the claim. Huntington argues that summary judgment should be denied because (1) the bad faith claim is timely pursuant to a tolling agreement ("Tolling Agreement") between the parties; (2) the terms of the Policy prohibited Huntington from bringing the claim before certain conditions precedent; and/or (3) a bad faith cause of action accrued each time AIG denied coverage. Pl.'s Suppl. Mem. Opp'n, ECF No. 69-1.

For ease of reference, the pertinent dates are aggregated below:

| | |
|---|---|
| **March 13, 2007** | Huntington submits complaints filed against it and requests coverage from AIG. |
| **April 27, 2007** | AIG denies coverage in response to 3/13/2007 request. |
| **August 1, 2012** | Bankruptcy court issues Report and Recommendation in Teleservices proceeding concluding, *inter alia*, that trustee could recover $72 million from Huntington. |
| **April 15, 2013** | Parties execute Tolling Agreement as to "any claims for coverage under the Policies, or any related claim or cause of action pursuant to the Policies." |
| **April 18, 2013** | Huntington submits "request for coverage analysis" to AIG, including documents from the Teleservices proceeding. |
| **May 24, 2013** | AIG denies coverage in response to 4/18/2013 request. |
| **September 28, 2015** | District court adopts 8/1/2012 Report and Recommendation; Huntington appeals. |
| **February 8, 2017** | Sixth Circuit announces *Meoli* decision (discussed *supra*, Statement of the Case, 2-6); case is remanded. |
| **March 2018** | Huntington settles Teleservices proceedings on remand. |
| **July 3, 2018** | Huntington sends letter to AIG demanding payment of $15 million under the Policy. |
| **August 13, 2018** | AIG denies coverage in response to the 7/3/2018 demand letter. |
| **September 18, 2019** | Parties engage in unsuccessful mediation for Huntington's claims for coverage. |

| | |
|---|---|
| **January 15, 2020** | Post-mediation "cooling-off period" expires, pursuant to the Policy. |
| **January 16, 2020** | Tolling Agreement expires after fourteen amendments. |
| **January 17, 2020** | Huntington files the instant action. |

The parties do not dispute that the bad faith claim is subject to a four-year statute of limitations under Ohio law. Ohio Rev. Code Ann. § 2305.09 (West). However, the parties disagree as to when the cause of action accrued and whether the time limitation was tolled.

### A. Accrual of Claim Upon Denial of Benefits

AIG argues that the statute of limitations began to run on Huntington's bad faith claim when AIG first denied coverage, citing *The Way Int'l, Inc. v. Exec. Risk Indem., Inc.*, No. 3:07CV294, 2009 WL 3157403, at *12 (S.D. Ohio Sept. 28, 2009). ECF No. 18, 12. But the keystone of AIG's position—that the limitations period begins running upon the *first* denial, irrespective of subsequent denials—is not supported by *The Way Int'l*. In that case, an unpublished opinion from a district court in this district, the court readily entertained the possibility that a *successive* denial was the proper starting point for the limitations period for a bad faith claim. 2009 WL 3157403 at *11-12. The insurer-defendants in that case first denied coverage in a letter from a claims examiner to the insured-plaintiff dated August 1, 2002. *Id.* at *11. On October 3, 2002, a second claims examiner for the insurer wrote to the insured, stating that he had taken over the file and would "provide a coverage analysis as soon as possible." *Id.* The second claims examiner followed up with a letter dated November 27, 2002, denying coverage (again). *Id.* The court cited *Kosa v. Frederick*, 136 Ohio App.3d 837, 839, 737 N.E.2d 1071, 1073 (2000) for the proposition that, for the purposes of the statute of limitations as to the tort of bad faith, "the loss occurred when claims were made against the plaintiff and the defendant denied coverage."[2] *The Way Int'l, Inc.*,

---

[2] But *Kosa* did not expressly conclude that a bad faith cause of action accrues upon the denial of the coverage, instead noting, in a footnote, that "there is an argument that the cause may not have accrued until the insurer denied any duty to defend or indemnify." 136 Ohio App.3d at 840, n.1.

[11]

2009 WL 3157403 at *12. Contrary to AIG's position that only the *first* denial starts the clock, the court found that "the loss occurred… no later than November 27, 2002," i.e., upon the second denial of coverage. *Id.*[3]

In sum, Ohio case law recognizes the potential for a bad faith cause of action to accrue upon circumstances distinct from an insurer's first denial of coverage. *See, e.g.*, *Bullet Trucking, Inc. v. Glen Falls Ins. Co.*, 84 Ohio App. 3d 327, 333, 616 N.E.2d 1123, 1126 (1992) (holding limitation period would commence when insurer "ceased… actions in refusing to pay for the covered loss"); *Kosa*, 136 Ohio App.3d at 840 (holding cause of action could have accrued when insured experienced loss, when insurer denied coverage, or when court issued declaratory judgment as to coverage); *cf. Hounshell v. Am. States Ins. Co.*, 67 Ohio St. 2d 427, 431, 424 N.E.2d 311, 314 (1981) (holding insurer can waive contractual limitation period when insurer "evidences a recognition of liability under the policy" which delays action by insured). This degree of flexibility appears to recognize the potential for an insurer to commit subsequent acts of bad faith.

While a denial of coverage may indeed be the most likely point at which a claim of bad faith will accrue, AIG overstates the extent to which Ohio law has developed a rigid rule to that effect. Generally, a cause of action accrues "when the last of all the elements of a tort necessary for the successful maintenance of an action occurs." 1A American Law of Torts § 5:33. The cases cited above are consistent with this principle, and consistent application of the same principle in the instant case would find that the bad faith cause of action accrued much later, when Huntington was first able to bring a colorable claim against AIG.

---

[3] The relevant suit was filed on July 3, 2007; thus, the court would find the action time-barred regardless of whether the limitations began running upon the first or second denial. *The Way Int'l, Inc.*, 2009 WL 3157403, at *12. Similarly, in *Kosa*, the appellate court found that "The earliest point in which this cause of action could have accrued was in 1988," and that the trial court "generously set the latest point… as 1990," but, "in either instance, appellant's [1997] suit is well outside the statute of limitations." *Kosa*, 136 Ohio App.3d at 840.

Clause 18 of the Policy provides that "no action shall lie against" AIG "until the amount of [Huntington's] obligation to pay shall have been finally determined." Policy, ECF No. 70-6, 12. In other words, Huntington could not maintain a claim against AIG until Huntington entered into the settlement agreement with the Teleservices trustee, and thus the amount of Huntington's obligation to pay was "finally determined." *Id.* Huntington's claim of bad faith could accrue no earlier, as Huntington could not bring the essential related claim—breach of contract pursuant to the Policy—until that point.

AIG cites caselaw which expressly distinguishes between contract-based claims and related claims for bad faith, holding that a contract-based limitation period will not bar a claim of bad faith, even if the underlying claim for breach is itself barred by the time provided in the contract. *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir. 1992) ( "[a bad faith] claim exists irrespective of the contractual liability, and the limitation period in the contract does not apply to such actions."); *Bullet Trucking, Inc. v. Glen Falls Ins. Co.*, 84 Ohio App. 3d 327, 333, 616 N.E.2d 1123, 1126 (1992) ("limitations clauses contained in the contract are inapplicable to claims based upon a breach of the duty of good faith."). Thus, AIG maintains the position that the claim of bad faith exists entirely independent of the Policy, and that therefore the limitations period expired on April 27, 2011, four years after the claim was first denied, irrespective of the fact that the breach of contract claim—the essential factual basis of the bad faith claim—could not be raised before a final determination of Huntington's obligation to pay, i.e., the bankruptcy settlement in March 2018.

But this theory would bring about the result that caselaw cited by AIG sought to avoid: barring the independent bad faith claim on the basis of a contractual limitation period. In this case, the contractual limitation period effectively prevented Huntington's breach of contact claim from

[13]

accruing until the final determination of its obligation to pay.[4] The bad faith claim, while not itself

based on any contractual terms, cannot have accrued prior to the breach of contract claim. Indeed,

while "the tort of bad faith is not a tortious breach of contract," (*Id.*) AIG understates the degree

to which Ohio courts have recognized the factual relationship between the two claims: "[T]he tort

of bad faith arises as a consequence of a breach of a duty established by a particular contractual

relationship… The duty may be breached only by an intentional failure by the insurer to perform

under its contract with the insured." *Id.* (citing *Motorists Mut. Ins. Co. v. Said* (1992), 63 Ohio

St.3d 690, 694-695).

### B.    The Tolling Agreement

AIG first denied coverage on April 27, 2007. Denial Letters, ECF No. 18-4, 2. Nearly six

(6) years later, following the report and recommendation from the bankruptcy court, Huntington

sought another coverage analysis on April 18, 2013. ECF No. 18-6. Contemporaneously with the

second request for coverage, the parties executed a Tolling Agreement dated April 15, 2013.

Tolling Agreement, ECF No. 18-7. The Tolling Agreement recited that "Huntington may have a

dispute with [AIG]" with respect to coverage under the Policy. *Id.* at 2. It further provided that

"Neither of the Parties desire for Huntington to assert any claims for coverage under the Policies,

or any related claim or cause of action pursuant to the Policies at this time, (the 'Claims for

Coverage')." *Id.* Therefore, the parties agreed to a period of time (subject to amendment/extension)

which would "not be included in measuring the period for asserting Claims for Coverage under

---

[4] The Court recognizes that, notwithstanding Clause 18, a breach of contract claim could accrue under the law prior to the amount of the obligation to pay being "finally determined." Policy, ECF No. 70-6, 12. But the communication from AIG make clear that the initial denial of coverage in 2007 was a "preliminary evaluation" in which AIG "reserve[d] its right to amend or supplement its position… as further information is developed in connection with this matter." Denial Letters, ECF No. 18-4, 3. The denial letter further states that "the coverage evaluation outlined below is based upon information received to date," and directs Huntington to "furnish [AIG] with any additional information that [Huntington] would like [AIG] to consider." *Id.* Regardless, because of the Tolling Agreement between the parties, the Court need not determine the exact accrual date of the breach of contract claim.

any applicable statute of limitations, laches, or any other defense based on the passage of time in any action or proceeding related to the Policies." *Id.* The Tolling Agreement was amended fourteen (14) times until it finally expired on January 16, 2020.

The parties strongly dispute whether the Tolling Agreement applies to the bad faith claim. AIG argues that the bad faith claim is not a "claim or cause of action pursuant to the Policies," a position which it argues is consistent with Ohio case law describing a bad faith claim as existing independent of contract terms. Defs.' Suppl. Mem. Supp., ECF No. 78, 9. Therefore, AIG asserts, the Tolling Agreement did not apply to the bad faith cause of action. *Id.* Huntington argues that testimony from the signatories to the Tolling Agreement reveals that it was intended to cover the bad faith claim. ECF No. 69-1, 2-3.

Ohio recognizes two types of bad faith claims in this context. *See Bullet Trucking, Inc.*, 84 Ohio App. 3d at 334; *Korwin v. State Farm Fire & Cas. Co.*, No. 5:23-CV-1124, 2024 WL 1514537, at *6 (N.D. Ohio Apr. 8, 2024). The first type of bad faith claim requires that the plaintiff "prove that the insurer had no lawful basis to deny coverage." *Essad v. Cincinnati Cas. Co.*, 2002-Ohio-2002, ¶ 34. The second type of bad faith claim arises from "an intentional failure to determine whether there was any lawful basis" for denying coverage. *Id.* at ¶ 32. A critical difference between the two types of bad faith claims is that the second type may arise independent of a breach of contract claim, while the viability of the first type "hinges on the success of the contract claim." *Id.* ¶ 34.[5] Huntington's claim is styled "Bad Faith Denial of Coverage" and describes a cause of action which would rise or fall with the breach of contract claim—i.e., the first type of bad faith claim. *See Id.*

---

[5] *See id.* ("By proving [that the insurer had no lawful basis to deny coverage], plaintiff is proving his contract claim.")

The Court finds that the Tolling Agreement operated to toll the limitation period for the bad faith claim. This is appropriate pursuant to Ohio law which recognizes that certain bad faith claims—Huntington's herein among them—are fatally intertwined with an associated breach of contract claim. *See Essad*, 2002-Ohio-2002 at ¶ 32. Furthermore, AIG's position that the bad faith claim does not exist "pursuant to the policies" is overly reliant on Ohio caselaw which recognizes the independent basis of a bad faith claim relative to a breach of contract claim, a theory which the Court has declined to adopt. *See supra*, 14; *cf. Eastham v. Nationwide Mut. Ins. Co.*, 66 Ohio App. 3d 843, 846, 586 N.E.2d 1131, 1133 (1990) ("[T]he insurer's duty of good faith and fair dealing derives from and exists solely because of its contractual relationship with its insured.")

The Court recognizes that such bad faith claims are not removed from the reach of the statutory limitations period in Ohio Rev. Code § 2305.09 by simple virtue of their dependence on differently-limited contract claims. But where the parties have specifically agreed not to litigate the associated contract claim and have continually extended such an agreement while related proceedings play out, the Court finds that the Tolling Agreement must necessarily pause the clock on the bad faith claim as well. Under Ohio law which recognizes that a bad faith claim may be concomitant with a contract claim, such claims are each a "claim or cause of action pursuant to the Policies," and thus covered by the Tolling Agreement. ECF No. 18-7, 2.

Because a claim for bad faith does not necessarily accrue upon the first denial of coverage, and because the Court determines that the Tolling Agreement encompasses the bad faith claim, AIG is not entitled to summary judgment on that claim.

[16]

## II.     Defendants' Motion for Summary Judgment

AIG filed a motion for summary judgment on November 19, 2021. Defs.' Mot. Summ. J., ECF No. 70. Therein, AIG raises various arguments as to why coverage is precluded for Huntington's claim under the Policy. Specifically, AIG argues that the loss claimed is uninsurable under Ohio law. However, in remanding this case to its present posture, the Sixth Circuit explicitly rejected this argument. *HNB*, 2024 WL 374571, *1. AIG's motion also contends that coverage is barred or limited by the terms of the Policy, specifically pointing the Court's attention to Endorsements 10, 7, and 5. ECF No. 70.

### A.     Endorsement 10

AIG argues that Endorsement 10 bars Huntington's claim for coverage based on the language of the endorsement excluding losses to which the insured "was not legally entitled." ECF No. 91, 7. AIG cites to its original briefing on the motions for summary judgment, arguing that it is entitled to judgment on this point notwithstanding the Sixth Circuit's reversal of this Court's prior grant of summary judgment in favor of AIG. *Id.*; ECF No. 70, 34-38. The relevant portion of Endorsement 10 describes the excluded claims as:

> (a)     arising out of or resulting, directly or indirectly, from any gaining of any profit or advantage to which any judgment, final adjudication, alternative dispute resolution proceeding, or any admission of any insured if evinced in written form, established the insured was not legally entitled;

Policy, ECF No. 70-6, 36. AIG argues that the bankruptcy court's judgment, and its affirmance, in relevant part, by the Sixth Circuit in *Meoli*, triggers this exclusion. ECF No. 91, 7. Additionally, AIG argues that the briefing by Huntington on remand from *Meoli* constitutes an "admission… evinced in written form" that the claim was for losses to which Huntington was not legally entitled. *Id.* Huntington, for its part, argues that the Sixth Circuit's more recent holding in *HNB* establishes

that Huntington was in fact legally entitled to the funds at issue pursuant to its contractual right as a creditor of the fraudulent companies. ECF No. 92, 15.

This Court did not address the application of Endorsement 10 in the order granting summary judgment for AIG, and the Sixth Circuit did not directly address it on appeal. Regardless, even if indirectly, the holding in *HNB* guides the result here as to the application of Endorsement 10. As the Sixth Circuit observed in concluding that the bankruptcy settlement was *not* uninsurable under Ohio law, "[l]iability under the fraudulent conveyance statutes is not tantamount to the type of culpable conduct that Ohio court have held precludes recovery." *HNB*, 2024 WL 374571, *11. Analogously, a finding of § 550(a)(1) transferee liability in this context does not alone constitute a "judgment… establish[ing] the insured was not legally entitled" (ECF No. 70-6, 36) to the loss at issue.

The Court finds that the clause at issue is ambiguous. On the one hand, AIG's interpretation, in essence, is to read "was not legal entitled" to mean "*is* not legally entitled." In other words, the present state of the insured—legally entitled or not—is the sole determinant. Under this interpretation, the finding of transferee liability in *Meoli* would trigger the exclusion, regardless of Huntington's prior legal entitlement to receive the property. On the other hand, another possible interpretation is that "was not legally entitled" means, effectively, "was *never* legally entitled."[6] Under this interpretation, the transferee liability at issue does not trigger the exclusion, because Huntington was indisputably entitled to collect the loan payments, regardless of how the bankruptcy court remedied conflicting entitlements.

Facially, the clause is susceptible to either interpretation. When confronted with ambiguity in a contract for insurance, the Court must construe the clause "strictly against the insurer and

---

[6] Such is the reasonable formulation invoked by both the Sixth Circuit and AIG in the slightly different context of discussing whether coverage would constitute a "windfall" for Huntington. *See HNB*, 2024 WL 374571, *13

liberally in favor of the insured." *King*, 35 Ohio St.3d at 519. As such, the Court finds that the exclusion is not triggered by the holding in *Meoli* that Huntington was liable as a § 550(a)(1) transferee. Huntington *was* legally entitled to receive the loan repayments, which the Sixth Circuit explicitly recognized in *HNB*: "Huntington had a legal interest in the property, because it had a contractual right to receive repayment of the loan." 2024 WL 374571, *13.

At bottom, the Sixth Circuit's holding rested on the understanding that the fundamentally remedial nature of bankruptcy proceedings distinguished Huntington's loss in this case from those in which the insured's conduct evinced "an intent to injure, malice, ill will, or other similar culpability." *Id.* at *11. The bankruptcy proceedings did not yield a determination that Huntington was *never* entitled to the loan payments; rather, the bankruptcy proceedings had the task of reconciling competing legal entitlements among Cyberco's creditors. The problem to be addressed was an *abundance* of legal entitlements to loan repayment funds—wrought by the fraudulent activities of Cyberco—not Huntington's lack of legal entitlement to the same.

In accordance with the reasoning in *HNB*, this Court finds that the "liability" ascribed to Huntington through the bankruptcy proceedings (the same which was "admitted… in writing in [Huntington's] briefs on remand to the bankruptcy court" (ECF No. 91, 7)), is distinguishable from the lack of legal entitlement contemplated by Endorsement 10. As such, the Court finds that Endorsement 10 does not bar coverage for the bankruptcy settlement, and therefore AIG is not entitled to summary judgment upon that basis.

## B.    Endorsement 5.

AIG next argues that it is entitled to summary judgment on the grounds that Endorsement 5 of the Policy bars coverage for the bankruptcy settlement. ECF No. 91, 8; ECF No. 70, 40-42.

Specifically, AIG points to the language of Endorsement 5, titled "Loan Servicing Endorsement," which provides that the insurer:

> shall not be liable to reimburse [Huntington] for damages in connection with any Claim arising out of, alleging, or in any way involving, directly or indirectly… any loans that are owned (not sold to any investor) for more than 12 months.

ECF No. 70-6, 27. Huntington, in turn, argues that this clause only applies to loans associated with real property, pointing to the next sentence in the clause, which states, "Mortgages held in the name of [Huntington] under mortgage-backed security pools shall be deemed to be sold to an investor." *Id.* Huntington further argues that Endorsement 5 is inapplicable because the underlying lending agreement between Huntington and Cyberco concerned a line of credit, not a traditional loan which would be implicated by Endorsement 5. As with Endorsement 10, *supra*, this Court did not address the application of Endorsement 5 in the order granting summary judgment for AIG, and the Sixth Circuit did not directly address it on appeal in *HNB*.

When both parties have offered separate, plausible interpretations of the policy language, the Court must "resolve any uncertainty in favor of the insured." *Neal-Pettit v. Lahman*, 2010-Ohio-1829, ¶ 17, 125 Ohio St. 3d 327, 330, 928 N.E.2d 421, 424. The interpretation put forth by AIG—that "any loans" includes the lending services at issue here—is not unreasonable. However, the Court is persuaded that, under Ohio law, proper construction of the contract provision yields a narrower exclusion.

Under Ohio law, courts "are directed to read the contract as a whole[,] giving meaning to every provision contained therein." *Helberg v. Natl. Union Fire Ins. Co.*, 102 Ohio App. 3d 679, 683, 657 N.E.2d 832, 834 (1995). Additionally, as noted by Huntington, Ohio courts apply "the time-honored maxim of construction, *expressio unius est exclusio alterius,* the inclusion of specific

[20]

things implies the exclusion of those not mentioned."[7] *Id.* at 835. When an insurance policy does not "clearly exclude" certain claims, "[i]t is not the responsibility of the insured to guess whether certain occurrences will or will not be covered based on nonspecific and generic words or phrases that could be construed in a variety of ways." *Andersen v. Highland House Co.*, 2001-Ohio-1607, 93 Ohio St. 3d 547, 549, 757 N.E.2d 329, 332.

Thus, when the Policy now before the Court is read accordingly, Huntington's interpretation of Endorsement 5—that "any loans" does *not* include the line of credit extended to Cyberco—begins to take plausible shape. Notwithstanding the variety of lending arrangements that could be generically described as a "loan," there is a meaningful distinction between a one-time loan and a line of credit. *See NewNet Commc'n Techs., LLC v. VI E-Cell Tropical Telecom, Ltd.*, 85 F. Supp. 3d 988, 997 (N.D. Ill. 2015) (describing the distinction between a one-time loan and line of credit as "fundamental"). And elsewhere in the Policy, the contracting parties appear to recognize that distinction; for example: "'Classified Loan' shall mean:… any loan, *or* transaction in the nature of a loan *or* extension of credit" (ECF No. 70-6, 30) (emphasis supplied); "'Past Due Loan' shall mean:… any loan, *or* transaction in the nature of a loan *or* extension of credit" (*Id.*) (emphasis supplied).

Two additional factors weigh in favor of the interpretation that Endorsement 5 (and the exclusion therein) does not apply to the line of credit extended to Cyberco. First, the provision in question applies to loans "owned… for more than 12 months." *Id.* at 27. This qualification—expressing a definite term of months—further implies that Endorsement 5 does not apply to a line

---

[7] "Any loan" is not, itself, a "specific thing" that would imply exclusion of things of like-specificity, but in conjunction with additional principles of insurance contract construction under Ohio law, the repeated distinction between "any loan" and "extension of credit" elsewhere in the policy yields the same implication: that the omission of "extensions of credit" should be read to reflect the intent of the parties that Endorsement 5 does not apply to such lending agreements.

of credit. While an extension of credit may be "owned… for more than 12 months," the defining feature of a line of credit is "a promise by the lender to extend credit, up to a specified sum, in such amounts and *at such times* as the borrower chooses." *NewNet Commc'n Techs., LLC,* 85 F. Supp. 3d at 997 (emphasis supplied). The "Revolving Credit Loan Agreement" between Huntington and Cyberco was executed on October 25, 2002, and listed a "Termination Date" of November 1, 2003. ECF No. 70-15, 3, 11. However, the language of the agreement did not refer to one 12+-month loan, but rather to "loans," plural, pursuant to the numerous "advances" Cyberco could request under the umbrella of the overall credit loan agreement:

> "Request for advance" shall mean a request for *a Loan* under the Revolving Note in the form attached as Exhibit "A" hereto.
> …
> "Revolving Note" shall mean a revolving credit executed and delivered by Borrower to Bank in the form attached as Exhibit "A" hereto as evidence of *Loans* from time to time outstanding…
> …
> [2.1(a)] <u>Revolving Loans</u>. Subject to the terms and conditions of this agreement, *Borrower may request Bank to make Revolving Loans* to the Borrower under the Revolving Note.

*Id.* at 10-11 (italics supplied). If each advance constitutes a individual loan, as the language of the agreement suggests, the exclusion of coverage for loans "owned… for more than 12 months" is a round hole for the square peg of a revolving credit agreement. This further supports an interpretation that the parties did not intend for Endorsement 5 to apply to the lending agreement between Huntington and Cyberco.

Second, the opening paragraph of Endorsement 5 states that AIG "shall not be liable to reimburse [Huntington] for *damages* in connection with any Claim arising out of… any loans." ECF No. 70-6, 27 (emphasis supplied). Endorsement 5 is unique in its reference to "damages" where the other Endorsements typically refer to "Loss." *See, e.g.*, *Id.* at 21, 23, 26, 29, 31, 40, 43, 45, 47 (variously excluding "any payment for Loss" in Endorsements 2-4, 6, 7, 12, and 14-16).

[22]

The Policy defines "Loss" as "damages, judgments, settlements and Defense Costs." *Id.* at 7. Thus, "damages," which is itself not defined by the Policy, is only one form of "Loss." Black's Law Dictionary defines "damages" as "Money claimed by, or ordered to be paid to, a person as compensation for loss or injury." Black's Law Dictionary (11th ed. 2019). Huntington seeks coverage for a loss in the form of a settlement of bankruptcy proceedings which did not concern "damages" as the term is understood in a law. *Cf. In re Teleservices Grp., Inc.*, 444 B.R. 767, 815 (Bankr. W.D. Mich. 2011) (Bankruptcy Court in this matter noting "Trustee has, in many ways, tried this matter as if Huntington should be assessed damages for its negligence."). Furthermore, *expressio unius est exclusio alterius* applies here: whereas "Loss" is defined to include "damages" and "settlements," and the majority of exclusions refer to "Loss," the reference solely to "damages" implies that "settlements" are not excluded from coverage under Endorsement 5.

In sum, because Huntington's claimed loss is not "clearly excluded" (*Andersen*, 93 Ohio St. 3d at 549), and because this Court must "resolve any uncertainty in favor of the insured" (*Neal-Pettit*, 125 Ohio St. 3d at 330), Endorsement 5 does not operate to bar coverage of Huntington's loss. Therefore, AIG is not entitled to summary judgment on this issue.

## C.     Endorsement 7.

Endorsement 7 in the Policy sets forth an exclusion "with respect to any Insured's performance of Lending Acts," for "Loss in connection with any Claim or Claims made against any Insured… for the principal and/or interest of any unrepaid, unrecoverable, or outstanding credit." ECF No. 70-6, 31. AIG previously argued that Huntington's loss was "unrepaid, unrecoverable, or outstanding credit" and thus was not covered under the Policy. This Court agreed and granted summary judgment in favor of AIG on this issue. *Huntington Nat'l Bank v. AIG Specialty Ins. Co.*, 646 F. Supp. 3d 950, 962 (S.D. Ohio 2022). The Sixth Circuit reversed that

[23]

holding, noting that AIG's interpretation "is one of multiple reasonable interpretations" of the exclusion language, but that such ambiguity "should be resolved in favor of Huntington." 2024 WL 374571, *15. Therefore, Endorsement 7 does not operate to exclude all coverage for Huntington's loss.

However, the parties now dispute whether Endorsement 7's sublimit of liability applies to limit Huntington's recovery. The Policy provides that the insured's recovery is limited to $5,000,000 "solely with respect to the Lender's Liability coverage afforded by this endorsement." ECF No. 70-6, 32. As with the exclusion under the same Endorsement, this sublimit of liability applies "with respect to any Insured's performance of Lending Acts." *Id.* at 31. "Lending Acts" are defined as "any act performed by an Insured for… a customer or client of the Company relating to an extension of credit, a refusal to extend credit or an agreement to extend credit." *Id.* at 30.

AIG contends that the Sixth Circuit settled this question on appeal, and indeed, the *HNB* opinion observes that "The parties do not dispute that Huntington was engaged in a Lending Act when it lent money to Cyberco, and thus that Endorsement 7 applies." 2024 WL 374571, *14.[8] Huntington takes issue with that characterization of its position, describing it as "dicta," and asserting that Huntington "**has**, in fact, disputed whether Endorsement 7 (including its sublimit language) applies at all to preclude or limit coverage."[9] ECF No. 93, 7. The Court agrees that *HNB*'s statement that "the parties do not dispute" the application of Endorsement 7 is indeed dicta. The opinion contains no other express reference to the issue of whether Huntington was engaged in a "Lending Act" pursuant to Endorsement 7—unsurprisingly, given the Sixth Circuit's impression that the matter was undisputed. The mandate rule requires this Court to "implement

---

[8] In a footnote, the *HNB* opinion also observes that "The Lender's Liability Extension in Endorsement 7 appears to cap liability for the insured's performance of Lending Acts at $5,000,000." *Id.* at n.1.

[9] Huntington cites to its voluminous briefing on this subject, which the Court has considered.

[24]

both the letter and the spirit of the mandate." *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 91 F. App'x 370, 374 (6th Cir. 2004). However, it is necessary that the issue "must squarely have been presented for decision"; by contrast, "'peripheral' statements as to issues that were not briefed or argued do not constitute law of the case," and thus do not implicate the mandate rule. *Id.* Though the parties did brief and argue this issue, the Sixth Circuit did not conduct any analysis and, in that sense, did not decide the issue for the purposes of the mandate rule. *Cf. United States v. Moored*, 38 F.3d 1419, 1422 (6th Cir. 1994) ("We find that the mere repetition of the factual findings… cannot be deemed a decision."). On the other hand, this Court's prior opinion granting summary judgment in favor of AIG noted that "Plainly, Huntington was… performing a lending act under the Policy," a holding which was apparently left undisturbed. ECF No. 84, 18. Regardless, this Court reaches the same result on remand.

Huntington argues that extrinsic evidence in the form of "competing expert testimony… and the admissions of AIG underwriters" (ECF No. 93, 8) demonstrates that Endorsement 7, properly construed, does not limit Huntington's recovery because the Loss did not arise "with respect to any Insured's performance of Lending Acts." ECF No. 70-6, 31. Specifically, Huntington argues that "lender liability provisions" such as Endorsement 7 "are designed to deal specifically with front-end and back-end activities." Thus, a "Lending Act," defined in the Policy as "any act… relating to an extension of credit, a refusal to extend credit or an agreement to extend credit," should be properly understood to include "activities involved with the making and initial origination of the loan" (front-end activities) and "enforcement or foreclosure on a loan" (back-end activities). But, most importantly to Huntington's position, a "Lending Act" does *not* include all the activities in between which, Huntington argues, describe the activities that gave rise to the

[25]

loss claimed under the Policy. However, the Court is not persuaded that the relevant conduct is so neatly excluded from the sublimit in Endorsement 7.

The Policy's definition of "Lending Act" is broad, referring to "*any act*" merely "*relating to* an extension of credit, a refusal to extend credit or an agreement to extend credit." ECF No. 70-6, 31. The underlying activities that gave rise to Huntington's loss involve the lending agreement between Huntington and Cyberco; namely, Huntington's continued servicing of Cyberco's line of credit despite Huntington's discovery of suspicious activities on the part of Cyberco. Notwithstanding Huntington's insistence to the contrary and reference to industry custom, the Court struggles to see how these activities could *not* be considered an "act… relating to… an agreement to extend credit." *Id.*

Huntington asserts that the industry custom is to understand coverage for "Lending Acts" as distinct from coverage from "Loan Servicing," the latter of which is the more accurate description of Huntington's activities giving rise to the loss. ECF No. 71, 45. Huntington cites to the declaration of its expert, Mr. Larry Goanos, as well as deposition testimony as evidence of this industry custom which would make clear that Huntington's loss is distinct from a "Lending Act" under the terms of the Policy. ECF No. 74, 55.

Under Ohio law, the Court can only consider extrinsic evidence of a contract's meaning when "the terms of the contract are ambiguous and then only to interpret, but not to contradict, the express language." *Ohio Hist. Soc'y v. Gen. Maint. & Eng'g Co.*, 65 Ohio App. 3d 139, 146, 583 N.E.2d 340, 344 (1989).[10] While the Sixth Circuit found that "the Endorsement 7 language is ambiguous and open to more than one reasonable interpretation," the ambiguity was noted in

---

[10] The Sixth Circuit's opinion in *HNB* addressed the matter of extrinsic evidence for the purposes of construing contract terms, noting that Ohio law departs from Sixth Circuit precedent in this regard, the latter of which provides that extrinsic evidence may be considered to determine the existence of an ambiguity. In contrast, "Ohio law is clear that the language must be ambiguous before the court considers extrinsic evidence." *HNB*, 2024 WL 374571, n.3 at *6.

[26]

reference to the specific exclusion for "any unrepaid, unrecoverable or outstanding credit," which was the primary focus of the analysis in *HNB*. 2024 WL 374571, at *15. Furthermore, the reviewing court understood the "Lending Acts" question to be an undisputed one, thus offering no reason to assess the language of the definition itself. *Id.* at *14.

This Court's prior opinion concluded that the "the exclusion is unambiguous" in rejecting Huntington's invitation to read the Policy in light of "the industry's understanding of the function of similar exclusions." ECF No. 84, 18 n.6. Finding no occasion to retreat from this conclusion, the Court's opinion remains the same as to the definition of "Lending Acts." The definition unambiguously encompasses the conduct giving rise to the loss in this matter. As such, Huntington's loss is subject to the $5,000,000 sublimit for Lending Acts. AIG is therefore entitled to summary judgment as to the applicability of the sublimit.

**III.  Plaintiff's Motion for Partial Summary Judgment.**

Huntington filed a motion for partial summary judgment on November 19, 2021. Pl.'s Mot. Summ. J. ECF No. 71. Therein, Huntington seeks summary judgment on certain affirmative and Policy-based defenses raised by AIG. *Id.* Specifically, Huntington argues that there is coverage under the Policy; that Huntington provided proper and timely notice of the loss under the Policy; that no endorsements to the Policy operate to bar coverage; and that AIG has no valid grounds to deny coverage based on representations by Huntington in its application for the insurance Policy. *Id.*

The Court has already determined that coverage exists under the Policy pursuant to Endorsement 7. *See supra*, § II.C. Furthermore, by application of the Sixth Circuit's holding in *HNB*, as well as this Court's reasoning herein, Endorsements 5, 8, and 10 do not operate to bar coverage. The Court addresses the remaining issues in Huntington's motion, below.

[27]

## A.       Exclusion 4 & Timely Notice.

Huntington argues that it is entitled to summary judgment with respect to certain defenses to coverage raised by AIG as to the timeliness of the notice provided by Huntington. ECF No. 71, 12. Specifically, Huntington argues that Exclusions 4(d) and 4(e) are inapplicable to the loss at issue, that the covered event—Teleservices' "Claim," for the purposes of the Policy, against Huntington—arose while the policy was in effect, and AIG was properly and timely notified of the same.

As an initial matter, Huntington argues that summary judgment is warranted to the extent that coverage is not barred by Exclusions 4(d) and 4(e). ECF No. 71, 37. Huntington cites to a letter from AIG, dated May 24, 2013, which denied Huntington's request for coverage while referring to these exclusions. *Id.* AIG does not address Exclusions 4(d) and 4(e) in its briefing beyond a general request that Huntington's motion be denied in that respect. In any event, the referenced provisions are plainly inapplicable; both Exclusions 4(d) and 4(e) refer to a "Continuity Date" which is set forth in the Declarations as October 6, 1998. ECF No. 70-6, 9. Coverage is barred under these exclusions for "pending or prior litigation as of the Continuity Date" (4(d)) and any "Wrongful Act, which, as the Continuity Date… [Huntington] knew or could have reasonably foreseen could lead to a Claim" (4(e)). *Id.* There is no dispute that the circumstances giving rise to the Claim at issue arose during the period that Huntington serviced a line of credit with Cyberco, beginning in late 2002, long after the Continuity Date. ECF No. 71, 14. Therefore, to the extent that there is any dispute as to the inapplicability of Exclusions 4(d) and 4(e), Huntington is entitled to summary judgment on that issue.

As to the timing of the Claim, AIG argues that coverage is barred because the Claim at issue was "first made" prior to the "Policy Period," defined in the Policy declarations as January

1, 2007, to January 1, 2008. ECF No. 73, 12; ECF No. 70-6, 4. Because this was received prior to the Policy Period, AIG contends that Huntington has not met its initial burden of establishing coverage under the Policy. *See Bosserman Aviation Equip., Inc. v. U.S. Liab. Ins. Co.*, 2009-Ohio-2526, ¶ 13, 183 Ohio App. 3d 29, 36, 915 N.E.2d 687, 693 ("The party seeking to recover under an insurance policy bears the burden of proof to demonstrate that the policy provides coverage for the particular loss").

A "Claim" for the purposes of the Policy is defined as "a written demand for monetary or non-monetary relief." ECF No. 70-6, 6. AIG puts forth two (2) theories in support of its Claim-first-made argument. First, (i) AIG argues that the Cyberco and Teleservices bankruptcy proceedings should be treated as a singular "Claim" under the Policy, and thus Huntington's receipt of the Cyberco complaint on December 8, 2006—prior to the Policy Period—should be considered the point in time when the Claim was "first made." Second, (ii) AIG argues that, even if the proceedings are *not* determined to be a singular "Claim," there remain genuine disputes of material fact as to when the Teleservices Claim was "first made," thus precluding summary judgment for Huntington on this issue.

i.    *Cyberco ≠ Teleservices.*

On December 8, 2006, the Cyberco bankruptcy proceedings were initiated against Huntington; therefore, AIG argues, "the Claim was first made, at the latest, when Huntington received the written demand for monetary relief," in the form of Cyberco's complaint. ECF No. 73, 31. On the other hand, Huntington argues that the relevant Claim was filed by Teleservices on January 19, 2007, served on Huntington on March 6, 2007, and reported by Huntington to AIG on March 13, 2007—all within the Policy Period. ECF No. 75, 15-16. Thus, central to the parties' dispute is whether the Teleservices Claim was the same as the Cyberco "Claim" such that the

"written demand" that Huntington received pursuant to the Cyberco filing was, effectively, *also* the Teleservices Claim. Huntington does not dispute that the entities and their respective Claims were related, but instead contends that the Policy does not have a "related claims" clause[11] which could operate to treat the Cyberco and Teleservices Claims as one. *Id.*

Notwithstanding the lack of a "related claims" clause, AIG argues that they should be treated as one singular Claim because: (1) the Claim(s) arose from the same "Wrongful Act" by Huntington; (2) the Claim(s) sought the same recovery in the form of the funds transferred to Huntington; (3) Huntington's settlement of the Teleservices bankruptcy proceeding was divided between Teleservices and Cyberco; and (4) "Cyberco and Teleservices generally were treated as one entity." ECF No. 73, 35-36.[12]

Huntington points to reasons for *not* treating the Cyberco and Teleservices Claim(s) the same. *See* ECF No. 75, 17-18. Beyond the legal fact of their separateness as two distinct entities, and the separateness of the proceedings to prosecute the claims, the Court finds it significant that the Bankruptcy Court specifically denied Huntington's motion to consolidate the separate proceedings. Huntington cites to "an arms-length settlement agreement" (*Id.*) between Cyberco and Teleservices which provided that "any recovery" by either entity from the then-pending actions against Huntington "shall be divided 75% to the Teleservices estate and 25% to the Cyberco estate." ECF No. 71-2, 213. That these entities could enter into such an agreement at all, and that it reflects an agreed division that is asymmetrical in favor of Teleservices, further supports Huntington's position that the Teleservices Claim, served on Huntington on March 6, 2007, should

---

[11] E.g., "[a]ll Related Claims will be treated as a single Claim made when the earliest of such Related Claims was first made." *Anderson-Tully Co. v. Fed. Ins. Co.*, 347 F. App'x 171, 172 (6th Cir. 2009) (quoting policy language).

[12] As explained *supra*, Cyberco was the banking customer of Huntington, while Teleservices was Cyberco's purported vendor to whom Huntington sent the loan funds directly on behalf of Cyberco. They were indisputably *related* entities, working in concert to perpetuate the fraud.

not be considered identical to the Cyberco Claim. Based on the above, the Court finds that Cyberco and Teleservices, and their respective "Claims," are distinct from one another for the purposes of the claim-first-made inquiry, and there is no genuine dispute of material fact which would threaten to displace this finding.

      ii.      *Huntington's first receipt of a "written monetary demand" from Teleservices.*

Alternatively, and regardless of the treatment of the Claims as distinct, AIG challenges Huntington's assertion that "there is no genuine dispute that the Teleservices [Claim] was made and reported during the [P]olicy [P]eriod." ECF No. 75, 18. AIG cites to a settlement meeting on November 28, 2006, attended by Huntington's representatives and its counsel, "at which the [Cyberco and Teleservices] Trustee[13] made a settlement demand on behalf of both Cyberco and Teleservices of $16,770,000." ECF No. 73, 33. Furthermore, AIG points to billing records from Huntington's counsel in 2006 that show that Huntington's counsel performed substantial work—prior to the Policy Period and the filing of either complaint—related to the then-impending Claims from Cyberco and Teleservices. *Id.* at n.13. AIG alleges that the billing records "indicate the existence of other written communications with the Trustee in 2006 that Huntington never produced" and that "Huntington has resisted producing its own documents related to this time period." *Id.*

---

[13] Initially, Trustee Thomas Richardson was appointed to both Cyberco and Teleservices. After the filing of both actions, Trustee Marcia Meoli replaced Richardson as Trustee for Teleservices "due to a conflict of interest of Thomas Richardson."

The settlement demand to which AIG refers has not been shown to be a "written monetary demand" such that would establish a "Claim" under the Policy.[14] By gesturing at allegedly deficient discovery responses, AIG means to imply the existence of a genuine dispute of material fact. However, Civil Rule 56 requires a greater showing than such an implication, in that a party must support a factual position by "citing to particular parts of materials *in the record*." Fed. R. Civ. P. 56 (emphasis supplied). Though the Court must construe all reasonable inferences on this issue in favor of AIG, as the nonmoving party, the inference that AIG would invite the Court to entertain—that evidence of possible never-produced discovery documents creates a genuine dispute of material fact—is not reasonable upon this record. *C.f. Gallinger v. N. Star Hosp. Mut. Assur., Ltd.*, 64 F.3d 422, 427 (8th Cir. 1995) ("[The assertion that a jury could decide in nonmovant's favor] ignores the fact that the [nonmovant] has failed to provide enough evidence to defeat the motions for summary judgment."). The requirement that a Claim must be reduced to writing serves an obvious evidentiary purpose. As against Huntington's evidence of a written demand first made during the Policy Period, AIG asks the Court to find a genuine dispute of material fact by pointing to an absence of evidence prior to the Policy Period. The Court declines to do so, and finds that Huntington is entitled to summary judgment as to whether the Claim was first made during the Policy Period.

### B.    Application-Based Defenses

Huntington seeks summary judgment with respect to additional defenses raised by AIG related to Huntington's representations in its application for insurance. Specifically, Huntington seeks summary judgment as to the following defenses raised in AIG's Amended Answer: (1) that

---

[14] The only writing reflecting this demand that AIG can cite to is a letter from Huntington's counsel dated January 2007 (i.e., within the Policy Period). The letter refers to the settlement offer of November 28, 2006, but does not indicate that the offer was a "written demand."

Huntington made a "material misrepresentation in its insurance application for policy year 2007" (ECF No. 52 at Defenses, ¶ 22); (2) that the Policy provides for exclusion of coverage for claims which "might reasonably be expected" to arise based on knowledge or information at the time the application is filled out (*Id.* at Defenses, ¶ 20) ; and (3) that Huntington failed to update or supplement the application with information received after the application was submitted (October 2006) but before the Policy Period commenced (January 1, 2007) (*Id.* at Defenses, ¶ 21).

    i.   *Material Misrepresentations.*

   In its Amended Answer, AIG contends that "[t]he Complaint fails because [Huntington] made a material misrepresentation in its insurance application for policy year 2007." *Id.* at Defenses, ¶ 22. Huntington seeks summary judgment against this defense, arguing that Ohio law does not recognize a common law "material misrepresentation" defense. ECF No. 71, 46.

   Question 8 of the insurance application, the site of the alleged misrepresentation, reads, in full: "Does any prospective insured have knowledge or information of any act, error or omission which might reasonably be expected to give rise to a claim under the proposed policy?" ECF No. 73-3, 3. On behalf of Huntington, then-CEO Thomas Hoaglin ("CEO Hoaglin") answered this question in the negative. *Id.*

   In its Response to Huntington's motion for summary judgment, AIG argues that the alleged misrepresentation is "an independent basis to deny summary judgment"—i.e., "even beyond the prior knowledge exclusion" provided in the text of the application. ECF No. 73, 62. Huntington specifically refutes this "independent basis" as a common law misrepresentation defense that Ohio law does not recognize. ECF No. 75, 34. AIG disputes the characterization of this defense as a "common law misrepresentation" defense (ECF No. 73, 53), but points to no other source of such an "independent basis." The lone case that AIG cites in support of this theory is inapposite, as it

[33]

discussed the effect of a misrepresentation based on the terms of the policy at issue, not based on any independent source. *See Nat'l Credit Union Admin. Bd. v. CUMIS Ins. Soc'y, Inc.*, No. 1:11 CV 1739, 2015 WL 1538822, at *17 (N.D. Ohio Apr. 7, 2015).

To the extent that AIG asserts a common law material misrepresentation defense, the Court finds that summary judgment for Huntington is appropriate. Ohio law does not recognize a common law misrepresentation defense based on alleged misstatements in the insurance application. *Fifth Third Mortg. Co. v. Chicago Title Ins. Co.*, 692 F.3d 507, 513 (6th Cir. 2012) ("Under Ohio law… an insurer cannot rescind a policy after becoming liable on it, unless the putative misrepresentation is written into the policy itself."). Ohio law does recognize policy-based defenses, which AIG has asserted and which are discussed below.

ii. *Policy-Based Exclusion Regarding Application Misstatements & Failure to Update*

Notwithstanding the lack of a common law material misrepresentation defense, AIG contends that the terms of the Policy itself operate to bar coverage due to Huntington's alleged misstatement as to its knowledge "of any act, error or omission which might reasonably be expected to give rise to a claim under the proposed policy" ("prior-knowledge exclusion") ECF No. 52 at Defenses, ¶ 20; ECF No. 73-3, 3. AIG further argues that coverage is barred due to Huntington's failure to update the application with additional information material to the application of which Huntington became aware between the time of the application and the inception of the policy. ECF No. 73, 53. Huntington seeks summary judgment against this line of defense, arguing, pursuant to *Allstate Ins. Co. v. Boggs*, 27 Ohio St. 2d 216, 271 N.E.2d 855 (1971), that the Policy lacks "the clear and unmistakable language that Ohio law requires… to use such purported errors to serve as a defense to coverage." ECF No. 75, 32.

[34]

In *Boggs*, an automobile insurance policy was issued to a driver who misrepresented his age and number of traffic violations on the insurance application. *Boggs*, 27 Ohio St. 2d at 218. Following an accident, the insurer "canceled the policy" and denied coverage for the accident, claiming that the driver's misrepresentations rendered the policy void *ab initio*.[15] *Id.* The Supreme Court of Ohio opined that "[s]tatements by insured fall into two classes": warranties and representations. *Id.* A breached warranty "voids the policy *ab initio*." *Id.* at 219. On the other hand, a misstatement by the insured as to a representation may render the policy merely voidable. *Id.* However, such a misrepresentation will render the policy voidable only "if shown to be material to the risk and fraudulently made," and, in any event, "may not be used to avoid liability after the accident has occurred." *Id.* at 221. Whether a statement is a warranty or representation generally turns on "the insurer's decision to incorporate the statement in or to omit it from the policy." *Id.* at 219.

*Boggs* directs the Court to consider whether a given statement is a warranty or representation by looking to the terms of the policy.[16] *Id.* For a statement to be incorporated by reference into the policy, "it must be done in unequivocal language on the face of the policy." *Id.* at 220. And if the validity of the policy is to depend on the veracity of such a statement[17]—i.e., a warranty—"such facts must appear clearly and unambiguously from the terms of the policy." *Id.* at 219.

The Supreme Court of Ohio held that the insurer in *Boggs* failed to incorporate the application and the statements therein into the policy. *Id.* at 221. The policy referred to the

---

[15] Legally, if the policy was indeed void ab initio, then there would be no policy to cancel.

[16] *But see id.* at 219 ("Courts do not favor warranties, or forfeitures from the breach thereof, and a statement as to conditions does not constitute a warranty unless the language of the policy, construed strictly against the insurer, requires such an interpretation.")

[17] "If it is his purpose to provide that a misstatement by the insured shall render the policy void *ab initio*…" *Id.* at 219.

[35]

application, but not in the "unequivocal language" of incorporation required to raise the stakes to forfeiture in the event of a misstatement: "the named insured agrees that the statements in the declarations and in the application for this policy are his agreements and representations, that this policy is issued in reliance upon the truth of such representations." *Id.* at 220.

Ohio courts apply the *Boggs* framework in the form of a two-pronged test. *Nat'l Credit Union Admin. Bd. v. CUMIS Ins. Soc'y, Inc.*, No. 1:11 CV 1739, 2015 WL 1538822, at *11 (N.D. Ohio Apr. 7, 2015); *cf. id.* at *13 ("*Boggs* has been applied in a myriad of contexts, including homeowner's policies, professional liability policies, and commercial premises policies."). First, the statement at issue must "plainly appear on the policy… or be plainly incorporated into the policy." *Id.* (quoting *Am. Family Ins. Co. v. Johnson*, 2010 WL 1712240 at * 3 (Ohio App. 8th Dist.2010)). Second, "the terms of the policy must clearly and unambiguously provide that a misstatement by the insured shall render the policy void *ab initio*." *Id.* (internal quotations omitted).

In the instant case, the first prong is satisfied, but the second prong is not. The first paragraph of the Policy provides, "in consideration of the payment of the premium, and in reliance upon the statements made to the Insurer *in the application attached hereto and made a part hereof*…[the Insurer] agrees as follows." ECF No. 70-6, 6 (emphasis supplied). This language is sufficient to effectively incorporate the insurance application and Hoaglin's answers therein. *See, e.g., Nat'l Credit Union Admin. Bd.*, 2015 WL 1538822, at *16 (gathering cases that found policy language sufficient to incorporate application).[18]

---

[18] *Cf.*, *Med. Protective Co. v. Fragatos*, 2010-Ohio-4487, ¶ 31, 190 Ohio App. 3d 114, 121, 940 N.E.2d 1011, 1017 ("It is understood and agreed that the statements made in the insurance application are incorporated into, and shall be a part of, this policy,"); *Unencumbered Assets, Tr. v. Great Am. Ins. Co.*, 817 F. Supp. 2d 1014, 1027 (S.D. Ohio 2011) ("These Declarations, along with the endorsements (if any) and the completed and signed Proposal Form shall constitute the contract between the Insured and Insurer."); *Winston v. Illinois Nat. Ins. Co.*, No. C-000251, 2001 WL 395154, at *3 (Ohio Ct. App. Apr. 20, 2001), *appeal dismissed, ordered not precedential sub nom. Winston v. Illinois*

However, the Policy lacks language which "clearly and unambiguously provide[s] that a misstatement by the insured shall render the [P]olicy void." *Id.* at *13. AIG directs the Court's attention to the language immediately following Question 8 on the application, which states "It is agreed that if such knowledge or information[19] exists, any claim or action arising therefrom is excluded from this proposed coverage." ECF No. 73-3, 3. But this does not "clearly and unambiguously provide" that Huntington's alleged misstatement would render the Policy void *ab initio*.

A policy need not specifically invoke the term "void *ab initio*" in order to satisfy *Boggs*, but the Policy at issue before the Court falls well short of what is required pursuant to Ohio case law. *See, e.g., Nat'l Credit Union Admin. Bd.*, 2015 WL 1538822, at *16 (gathering cases finding second prong of *Boggs* satisfied).[20] The language cited by AIG attaches no conditions to the veracity of the statements contained in the application, let alone any indication that the entire Policy would be void in the event of a misrepresentation.

By the same token, the Policy does not provide for any forfeiture of coverage based upon Huntington's failure to update the information in the application. The application provides that the applicant "agrees that if the information supplied on this application changes between the date of this application and the effective date of the insurance, he/she (undersigned) will immediately notify the insurer of such changes." ECF No. 73-3, 3. As noted above, the Policy language

---

*Natl. Ins. Co.*, 2002-Ohio-2582, 95 Ohio St. 3d 1223, 769 N.E.2d 393 ("[policy is issued] in reliance upon the statements made in the application and declarations attached hereto and made part hereof.").

[19] "Such knowledge or information" being that "of any act, error, or omission which might reasonably be expected to give rise to a claim under the proposed policy." ECF No. 73-3, 3.

[20] *C.f.*, *Pers. Serv. Ins. Co. v. Clinton Lester*, 2006-Ohio-5199, ¶ 18 ("We may void coverage under this policy if you or an insured person have knowingly concealed or misrepresented any material fact or circumstance… If we void this policy, it will be void from its inception (void ab initio), as if the policy never took effect"); *Winston*, 2001 WL 395154, at *3 ("This policy is void in any case of fraud by you relating to it. It is also void if you intentionally conceal or misrepresent a material fact or circumstance"); *Unencumbered Assets, Tr.*, 817 F. Supp. 2d at 1027 ("In the event that any statement or misrepresentation in the Application is untrue, this Policy shall be void and of no effect whatsoever").

[37]

incorporates the application, and thus this agreement to "immediately notify." However, the Policy does not provide that a failure to notify will operate to void the Policy and does not provide for any specific coverage limitations related to the failure to notify.

Because the Policy does not clearly and unambiguously provide that misstatements will operate to void the Policy, Huntington is entitled to summary judgment as to AIG's defenses that (1) coverage is barred by falsehoods in the insurance application; and that (2) coverage is barred by Huntington's failure to notify AIG pursuant to the application.

> iii.    *Prior Knowledge Exclusion – Knowledge-in-fact*

AIG argues that coverage is barred by the prior-knowledge exclusion because, regardless of whether the application answers are truthful, Huntington had actual knowledge of the "act(s), error(s) or omission(s)" which precipitated the Claim against Huntington for which coverage is disputed. ECF No. 52 at Defenses, ¶ 20. Huntington seeks summary judgment as to this defense, arguing that CEO Hoaglin's responses on the application are accurate as to his personal knowledge, and that the application failed to include language which would require more than the personal knowledge of the individual completing the application. ECF No. 75, 33-34.

As discussed *supra*, the prior-knowledge exclusion has two constituent parts, both contained in the text of the application. First, Question 8 asks, "Does *any prospective insured* have knowledge or information of any act, error or omission which might reasonably be expected to give rise to a claim under the proposed policy?" ECF No. 73-3, 3 (emphasis supplied). Second, immediately after Question 8, the application provides, "It is agreed that if such knowledge or information exists, any claim or action arising therefrom is excluded from this proposed coverage." *Id.*

As an initial matter, the Court agrees with AIG's construction of the prior-knowledge exclusion to the extent that it is triggered by actual knowledge of "any prospective insured." *Id.*

[38]

*See Coregis Ins. Co. v. Lyford*, 21 F. Supp. 2d 695, 699 (S.D. Tex. 1998) (construing similar clause to mean "[A]ctual knowledge of an impending claim on the part of 'any' insured is what triggers the policy exclusion with respect to all insureds."). Thus, even if the Court were to accept Huntington's contention that CEO Hoaglin did not have personal knowledge which would trigger the exclusion, it could not dispose of the prior-knowledge issue without also considering the knowledge of "any [other] prospective insured." To that point, the policy defines "Insured" as "(1) the Company" and "(2) any past, present or future director, officer or employee of the Company." ECF No. 70-6, 6.

What constitutes "knowledge or information" sufficient to trigger this exclusion is another question. Courts in Ohio have limited the scope of such prior-knowledge exclusions to apply to losses which are "certain" or "substantially certain." *Buckeye Ranch, Inc. v. Northfield Ins. Co.*, 2005-Ohio-5316, ¶ 36, 134 Ohio Misc. 2d 10, 27, 839 N.E.2d 94, 107. In *Buckeye Ranch*, the Court of Common Pleas observed that Ohio has not adopted the "known loss" doctrine to the extent that the legal concept refers to a matter of common law applicable to insurance contracts irrespective of express contractual language. *Id.* at ¶ 28.[21] The dispute in *Buckeye Ranch* concerned an express policy exclusion which stated that the coverage "does not apply to any damages arising out of any act, error, omission or prior litigation which is known by the Insured as of the inception date of this policy." *Id.* at ¶ 14. Notwithstanding Ohio's lack of common law "known loss" doctrine, the court in *Buckeye Ranch* found that the doctrine "speaks squarely to this situation," and that the scope of the exclusion is "appropriately examined having in mind the 'known loss' doctrine as it has developed throughout many jurisdictions." *Id.* at ¶ 24, ¶ 28.

---

[21] But see *Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1281 (6th Cir. 1995) (applying Ohio law and holding that the related implied requirement of fortuity is "universally recognized").

Surveying cases which discussed the "known loss" doctrine, as well the related concepts of "loss-in-progress" and "fortuity," *Buckeye Ranch* concluded, in sum:

> No matter how the doctrine is formulated in its fine points, the decisions emphasize the importance of *"knowledge" actually possessed* by an insured… *[T]he doctrine is triggered by an awareness that a loss is "certain" or "substantially certain."* More is required than mere awareness of a potential risk of a loss or of the potential that damages may arise sometime in the future traceable to some act known to have occurred in the past.

*Id.* at ¶ 36 (emphasis supplied). With that understanding, the court in *Buckeye Ranch* held that the exclusion for prior acts did not bar coverage in that case, despite the language of the exclusion which appeared to invite a broader interpretation. *Id.*

*Buckeye Ranch*, from an Ohio trial court, is of limited precedential value and distinguishable in important respects.[22] However, *Buckeye Ranch* has been cited with approval by courts in this district as well as the Sixth Circuit. *See, e.g.*, *Fifth Third Mortg. Co.*, 692 F.3d at 512; *Tunnell Hill Reclamation, LLC v. Endurance Am., Specialty Ins. Co.*, No. 2:15-CV-2720, 2016 WL 3689100, at *5 (S.D. Ohio July 12, 2016); *Burlington Ins. Co. v. PMI Am., Inc.*, 862 F. Supp. 2d 719, 734 (S.D. Ohio 2012), *order clarified,* No. 2:08-CV-1054, 2012 WL 1665867 (S.D. Ohio May 10, 2012) ("This Court agrees with the reasoning of the *Buckeye Ranch* court."); *cf. Nat'l Cas. Co. v. Franklin Cnty., Miss.*, 718 F. Supp. 2d 785, 794 (S.D. Miss. 2010) (citing *Buckeye Ranch* for support in holding that "the requirement of subjective knowledge necessarily refers to the actual knowledge possessed by the insured at a relevant point in time").

---

[22] Most notably, in *Buckeye Ranch*: (1) the language of the exclusion, while similar, is not identical to that before the Court; and (2) the policy at issue was an occurrence-based policy, in contrast to the claims-made policy before the Court. This latter factor is especially pertinent because the "known loss" exclusion was considered in the context of "prior-act coverage" specifically purchased to facilitate the insured's transition from a claims-made to an occurrence-based policy. Thus, the *Buckeye Ranch* conclusion was premised, at least in part, on the "reasonable-expectations doctrine," insofar as the overly broad interpretation of the exclusion put forward by the insurer was determined to conflict with the very purpose of the insurance coverage negotiated by the parties.

[40]

In the instant case, AIG points to evidence suggesting that Huntington was well aware of the impending claims from Cyberco and Teleservices at the time of the application. ECF No. 73, 62-66. This evidence is primarily comprised of billing records and correspondence from Huntington's counsel. For example, AIG contends that, for over two years prior to the inception of the Policy, "Huntington's counsel was researching Huntington's liability for the fraudulently transferred funds it received from Cyberco and Teleservices." *Id.* Furthermore, billing records show that Huntington's counsel was in contact with the counsel for the bankruptcy trustee as early as August, 2006, with the time entry referring to a "possible trustee request for tolling agreement." ECF No. 73-2, 38. On one hand, the Policy's definition of "Insured" does not include Huntington's counsel, and as such, this evidence does not, alone, trigger the prior-knowledge exclusion.[23] But on the other hand, knowledge held by Huntington's counsel could be evidence of knowledge held by an "Insured" for the purposes of the Policy, and, specifically, discussing a potential tolling agreement with the trustee—the party that would eventually bring suit—appears to strongly indicate the potential for a Claim.

Unsurprisingly, a prior-knowledge exclusion turns on a fact-intensive inquiry. *Buckeye Ranch, Inc.*, 2005-Ohio-5316 at ¶ 27 (quoting *Outboard Marine Corp. v. Liberty Mut. Ins. Co.* (1992), 154 Ill.2d 90, 104, 180 Ill.Dec. 691, 607 N.E.2d 1204) ("The extent of the insured's knowledge of the loss must be determined on a case-by-case basis."). The immediate dispute is no exception. The Court finds that AIG has demonstrated a genuine dispute of material fact as to whether "any Insured" had sufficient knowledge to trigger the prior-knowledge exclusion, thereby barring coverage.[24] As such, Huntington is not entitled to summary judgment on this issue.

---

[23] Plus, the Court is aware that a lawyer's research into a potential claim could just as well come far upstream from the point at which such claim is "reasonably foreseeable" to a layperson.

[24] An additional question arises regarding the Cyberco complaint, received in December 2006, prior to the policy period. Huntington did not update the application answers in light of the Cyberco complaint, but the Court has already

## **CONCLUSION**

As to Defendants' Motion for Partial Summary Judgment (ECF No. 18), for the reasons set forth *supra*, § I., the motion is **DENIED**.

As to Defendants' Motion for Summary Judgment (ECF No. 70), for the reasons set forth *supra*, § II., the motion is **GRANTED** in part. The Court finds that the sublimit set forth in Endorsement 7 of the Policy is applicable because Huntington's loss arose from a "Lending Act" for the purposes of the Policy. Defendants are therefore entitled to partial summary judgment on that issue; the motion is **DENIED** as to the balance of the relief therein requested.

As to Plaintiff's Motion for Partial Summary Judgment (ECF No. 71), for the reasons set forth *supra*, § III., the motion is **GRANTED in part**. The Court finds that there is coverage under the Policy; that Exclusions 4(d) and 4(e) do not bar coverage; that Endorsements 5, 7, 8, and 10 and any exclusions therein do not operate to bar coverage, notwithstanding the sublimit in Endorsement 7, which does apply; and that AIG cannot avoid coverage based on any false statements or representations by Huntington in the application for insurance. Therefore, Huntington is entitled to summary judgment on those issues. However, a genuine issue of material fact persists regarding Huntington's prior knowledge of the claim at issue. As such, the motion is **DENIED** as to the balance of the relief therein requested.

**IT IS SO ORDERED**.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: June 27, 2024

---

rejected such grounds to avoid coverage. But does the Cyberco complaint trigger the prior-knowledge exclusion, regardless of the application answers? Having already decided that the Cyberco and Teleservices proceedings were distinct "Claims made," the Court finds that this, too, presents a factual dispute precluding judgment at this time. This is especially true because receipt of the Cyberco complaint could reasonably be understood to cut either way: (1) that a Teleservices Claim was likely to follow based on the closely-related circumstances, or (2) that a Teleservices Claim was *unlikely* to follow given that the Cyberco complaint covered much of the same ground such that a subsequent Teleservices Claim could figure to be redundant.